In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-1500

RODGER THORNTON,

*Plaintiff-Appellant,*

*v.*

DONALD N. SNYDER, JR., Director,
JAMES M. SCHOMIG, Warden, and
CAPTAIN JOSH J. SHETTLEWORTH,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 01 C 1347—**Harold A. Baker**, *Judge.*

ARGUED JUNE 3, 2005—DECIDED NOVEMBER 3, 2005

Before CUDAHY, POSNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Rodger Thornton, an inmate in
the Illinois Department of Corrections, filed a civil rights
action alleging that prison officials violated his right to be
free from cruel and unusual punishment. The district court
granted summary judgment in the defendants' favor on his
cell conditions claims but allowed a claim concerning yard
exercise privileges to continue. Thornton raises two issues
on appeal. First, he argues that summary judgment on his
cell conditions claims was inappropriate, as he contends
that he exhausted his administrative remedies. Because
Thornton filed grievances concerning his cell conditions that

corrections officials remedied before the conclusion of the administrative grievance process, we agree with Thornton that he exhausted his administrative remedies. Therefore, we reverse the grant of summary judgment on Thornton's cell conditions claims. In addition, although Thornton maintains the district court's decision to conduct the trial of the yard exercise claim by videoconference was erroneous, we conclude that the district court did not abuse its discretion when it conducted the trial of his remaining claim by videoconference and so affirm the judgment in favor of the defendants on that claim.

## I.  BACKGROUND

Rodger Thornton is an inmate in the Illinois Department of Corrections serving a life sentence. On January 13, 2000, after a disciplinary charge, corrections officials placed Thornton in Cell 106 of the Pontiac Correctional Center, a segregation cell. Several days later, he wrote letters to defendants Donald Snyder, Jr., Director of the Pontiac Correctional Center, Warden James Schomig, and Captain Josh Shettleworth expressing displeasure about the conditions of his cell. He received no response. On January 28, Thornton submitted an emergency grievance to Warden Schomig complaining about the conditions in his cell. In this grievance, he asked to be moved from his cell.[1] Thorn

---

[1]  As written, the grievance stated in part:

> This seg cell north 106 is in very poor shape. There appears to be human feces smeared on the walls covering most of the inside of the cell. It has a foul smell to it. The toliet leaks. There is 2 to 3 inches of water on the floor, it clearly has a sewer aroma to it. The water that comes from the sink is discolored it looks like rust water. The conditions of this mattress sir is so bad that there is no way that I can or will sleep on it. Its stained and its got

(continued...)

ton subsequently received a let-ter stating that his griev-
ance did not constitute an emergency.

By February 22, officials had transferred Thornton from
Cell 106 to Cell 752. On that day, Thornton filed a griev-
ance concerning the poor condition of the mattress in Cell
752. He requested a clean mattress. After receiving another
unsatisfactory mattress, Thornton was furnished with a
satisfactory mattress on May 11. On May 12, prison officials
dismissed the February 22 grievance as moot because
Thornton had received an acceptable mattress. The record
contains no indication that Thornton appealed either
grievance to Director Snyder.

Thornton later filed a lawsuit pursuant to 42 U.S.C.
§ 1983, alleging that the defendants violated his Eighth
Amendment right to be free from cruel and unusual
punishment. First, he sought damages for the time confined
in Cell 106 and for the time confined in Cell 752 without
mattress. In addition to the claims concerning his cell
conditions, he alleged that officials denied him the privilege
of yard exercise for approximately 7½ months. The district
court granted the defendants' motion for summary judg-
ment on his cell condition claims, reasoning that Thornton
failed to exhaust his administrative remedies with respect
to these claims.

In contrast, the district court denied the defendants'
motion for summary judgment on Thornton's deprivation of
yard exercise claim. Before trial, the district court received
evidence concerning Thornton's security risk at an *ex
parte* hearing. A casework supervisor at the Stateville

---

[1]  (...continued)
> a piss smell to it . . . . I can't even eat cuz of the smell
> in this cell. I've already had several asthma attacks since
> I've been back here. Sir please help this is just not right
> at all. . . . Please I beg of you before I contract some
> major health problems get me out of here.

Correctional Center in Joliet, Illinois, where Thornton was incarcerated at the time, testified under oath that Thornton was serving a life sentence. She further testified that Thornton, thirty-four years old at the time, was classified as an "extremely high escape risk." She stated he had a "moderate aggression level" and was currently assigned to a unit for inmates with "high to moderate aggression levels." In addition, she told the court that at least two security officers, including one lieutenant, would be needed to transport him to court.

In light of the high security and escape risk Thornton posed, in addition to the fact that approximately twenty persons from the Department of Corrections (both inmates and employees) were listed as potential witnesses, the district court decided to conduct the trial by video-conference. At trial, Thornton and the prosecutors appeared via videoconference and were not physically present in the courtroom with the jury. In addition, all the witnesses testified by videoconference, save one that testified by telephone. The jury returned a verdict for the defendants, and Thornton appeals.

## II.  ANALYSIS

### A.  Exhaustion of Administrative Remedies

We review the district court's grant of summary judgment de novo. *McCoy v. Gilbert*, 270 F.3d 503, 508 (7th Cir. 2001). "Ordinarily, plaintiffs pursuing civil rights claims under 42 U.S.C. § 1983 need not exhaust administrative remedies before filing suit in court." *Porter v. Nussle*, 534 U.S. 516, 523 (2002). In 1996, however, as part of the Prison Litigation Reform Act ("PLRA"), Congress made exhaustion a mandatory prerequisite for a prisoner's suit concerning the conditions of his confinement brought under section 1983. *Porter*, 534 U.S. at 524. The PLRA's exhaustion provision now reads: "No action shall be brought with respect to

prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life," *Porter*, 534 U.S. at 532, and "an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). An inmate's perception that exhaustion would be futile does not excuse him from the exhaustion requirement. *Id.*; *Perez v. Wisc. Dep't of Corrections*, 182 F.3d 532 (7th Cir. 1999). "Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter*, 534 U.S. at 524 (citing *Booth*, 532 U.S. at 741); *see also Riccardo v. Rausch*, 375 F.3d 521, 523 (7th Cir. 2004).

The Illinois Department of Corrections has an established grievance process. *See* 20 Ill. Admin. Code §§ 504.800 *et seq*. An inmate can submit a written grievance to a designated grievance officer, who submits his recommendation to the institution warden. 20 Ill. Admin. Code §§ 504.810, 504.830. The warden "shall advise the offender of the decision in writing within 2 months after receipt of the written griev-ance, where reasonably feasible." 20 Ill. Admin. Code § 504.830(d). Alternatively, an inmate can request that a grievance be handled on an emergency basis by submitting the grievance directly to the warden. 20 Ill. Admin. Code § 504.840. If the warden determines that there is a substan-tial risk of imminent personal injury or other serious or irreparable harm, the grievance is to be handled on an emergency basis. 20 Ill. Admin. Code § 504.840. The process also provides: "If, after receiving the response of the [warden], the offender still feels that the problem, com-plaint, or grievance has not been resolved to his or her

satisfaction, he or she may appeal in writing to the Director within 30 days after the date of the decision." 20 Ill. Admin. Code § 504.850. Money damages are not available.

We begin with the defendants' argument that Thornton did not even begin the grievance process for his claim concerning the conditions in Cell 106. The defendants contend that after corrections officials deemed the grievance not an emergency, the grievance ceased to exist. We disagree. Thornton followed the proper procedure for filing a grievance that he considered an emergency by submitting his grievance directly to the warden. *See* 20 Ill. Admin. Code § 504.840 ("An offender may request a grievance be handled on an emergency grievance by forwarding the grievance directly to the [warden].") The response he received from the warden made no comment on the merits of the grievance and indicated only that the warden did not consider his complaint worthy of emergency treatment. Perhaps, paradoxically, Thornton might have received a transfer sooner had he not deemed his request an emergency. There is nothing in the current regulatory text, however, that requires an inmate to file a new grievance after learning only that it will not be considered on an emergency basis. In any event, even if the non-emergency determination was a decision that should have been appealed, corrections officials moved Thornton out of Cell 106 within three weeks of his January 28, 2000 grievance, before the thirty-day time for an inmate to appeal a warden's determination had expired.

We turn now to the heart of the case. Thornton contends that he exhausted all the remedies that were available to him with respect to his cell condition complaints, as he filed grievances and then received exactly what he had requested in these grievances. Thornton's first grievance, filed January 28, 2000, complained about the conditions in Cell 106. In the "Relief Requested" section of his grievance, Thornton wrote, "To be moved from this dangerous cell

immediately." By February 22, officials had transferred him to Cell 752, thereby granting him the transfer out of Cell 106 he had requested. This transfer occurred before the expiration of the two-month time period within which grievance procedures provide that a warden should advise an inmate of a decision on the merits.

Thornton also received the result he sought with respect to his Cell 752 mattress grievance. On February 22, 2000, Thornton filed a grievance that complained about the poor condition of his mattress in Cell 752. In his grievance, he requested a clean mattress, and he subsequently received an adequate mattress. The grievance officer then recommended that "[Thornton's] grievance be found moot as he has been issued a replacement mattress." The next day, the warden concurred, and the grievance was dismissed as moot.

In support of their argument that Thornton did not exhaust his administrative remedies, the defendants point to the provision in the grievance process for appeals to the Director of the Department of Corrections from warden determinations that do not resolve the grievance to an inmate's satisfaction. *See* 20 Ill. Admin. Code § 504.850. They correctly state that there is no evidence Thornton appealed either cell condition grievance to the Director. The defendants then conclude that Thornton failed to exhaust his administrative remedies, maintaining that even though Thornton received what he requested in his grievances, he nonetheless needed to continue to appeal to higher channels in order to exhaust.

As the defendants emphasize, the PLRA requires exhaustion of "all available" remedies, and this requirement applies to "all" suits about inmate life. *See Porter*, 534 U.S. at 524, 532. Unlike the defendants, however, we do not take the requirement to exhaust "all available" remedies to mean Thornton must appeal grievances that were resolved as he requested and where money damages were not available.

The requirement to exhaust "all 'available'" remedies requires that *some* remedy is available to the inmate through the administrative process, even if not necessarily the relief desired. In *Perez v. Wisconsin Department of Corrections*, 182 F.3d 532 (7th Cir. 1999), we observed:

> It is possible to imagine cases in which the harm is done and no further administrative action could supply *any* "remedy." . . . Suppose the prisoner breaks his leg and claims delay in setting the bone is cruel and unusual punishment. If the injury has healed by the time suit begins, nothing other than damages could be a "remedy," and if the administrative process cannot provide compensation then there is no administrative remedy to exhaust.

*Perez*, 182 F.3d at 538. The Tenth Circuit's decision in *Ross v. County of Bernadillo*, 365 F.3d 1181 (10th Cir. 2004), decided after *Booth*, is similarly instructive. There, an inmate filed a grievance requesting that shower mats be placed on his shower floor. Shortly thereafter, prison officials furnished the shower with a mat, thus alleviating the problem the inmate had raised in his grievance. The court found that the inmate had exhausted his administrative remedies with respect to the shower mat grievance, stating, "Once a prisoner has won all the relief that is available under the institution's administrative procedures, his administrative remedies are exhausted. Prisoners are not required to file additional complaints or appeal favorable decisions in such cases. When there is no possibility of any further relief, the prisoner's duty to exhaust available remedies is complete." 365 F.3d at 1187. *See also Ortiz v. McBride*, 380 F.3d 649, 653 (2d Cir. 2004) ("All parties agree, as do we, that Ortiz has exhausted his administrative remedies with respect to his due process claim. He appealed the Tier III hearing and obtained a reversal. He did not appeal to the highest level of DOCS,

but inasmuch as he obtained a favorable determination regarding his due process claim, no such further appeal was required."). Here, too, with monetary relief unavailable, there was simply no "remedy" that a higher appeal could provide after Thornton received the transfer and new mattress he requested.

Nonetheless, the defendants persist in arguing that Thornton's situation is no different from that in cases such as *Booth v. Churner*, 532 U.S. 731 (2001), which hold that futility is not an excuse for the failure to exhaust available administrative remedies. *Booth*, however, does not help the defendants. In *Booth*, the Supreme Court considered whether the requirement to exhaust "such administrative remedies as are available" required an inmate seeking only money damages to "complete a prison administrative process that could provide *some sort of relief* on the complaint stated, but no money." 532 U.S. at 734 (emphasis added). Before filing suit in federal court, the inmate had filed an administrative grievance. In it, he sought several forms of injunctive relief and money damages, but as in Illinois, the state grievance process did not provide for money damages. The prison authority denied his request for relief, and the inmate did not seek further review even though the state provided for such process. The Supreme Court held that although the prison administrative process could not provide monetary compensation as relief, the inmate was still required to exhaust his administrative remedies.

*Booth*'s holding does not speak to Thornton's circumstances. Unlike here, there was in *Booth* still the possibility of some relief that prison officials could have offered that might have satisfied the inmate. As we have said, here, though, the inmate already received what he requested in his grievances. If anything, *Booth* supports Thornton's position. The Court made it a point to state that in the case

before it, "Neither [party] denies that some redress for a wrong is presupposed by the statute's requirement of an 'available' 'remed[y],'" 532 U.S. at 736, and then explicitly noted, "Without the possibility of some relief, the administrative officers would presumably have no authority to act on the subject of the complaint, leaving the inmate with nothing to exhaust." *Id.* at 736 n.4.

The defendants also point to policy considerations behind the PLRA's exhaustion requirement and contend that these policies can only be served by requiring an inmate like Thornton to continue to seek higher review in the administrative chain. In particular, the defendants stress that a grievance can put prison officials on notice of a systemic problem that, once remedied, will allow them to avoid similar complaints in the future. *See Porter*, 534 U.S. at 524. Therefore, the defendants argue, an inmate in Thornton's situation should be required to pursue further administrative review. We do not agree with the defendants' logic. Thornton submitted grievances, so prison officials were on notice of his complaints, and we do not think it Thornton's responsibility to notify persons higher in the chain when this notification would be solely for the benefit of the prison administration. Moreover, appealing a favorable result risks reversal. And reversals of once-favorable results would tend to increase, not decrease, the number of inmate suits, running counter to another recognized policy behind the PLRA's exhaustion requirement, "to reduce the quantity and improve the quality of prisoner suits." *See Porter*, 534 U.S. at 524.

In short, the defendants' notion that Thornton should have appealed to higher channels after receiving the relief he requested in his grievances is not only counterintuitive, but it is not required by the PLRA. Accordingly, we find that Thornton exhausted his administrative remedies, and we reverse the district court's entry of

summary judgment against him on his cell conditions claims.

### B. Trial by Videoconference

Thornton also contends that the district court abused its discretion when it conducted the jury trial of his remaining civil rights claim by videoconference and did not allow Thornton to be physically present in the courtroom. The civil, not criminal, nature of Thornton's trial is important. Although due process prohibits the denial of access to the courts, a prisoner does not have a constitutional right to attend the jury trial of his civil rights claim involving the conditions of his confinement. *Jones v. Hamelman*, 869 F.2d 1023, 1029-30 (7th Cir. 1989); *Stone v. Morris*, 546 F.2d 730, 735 (7th Cir. 1976); *see also Price v. Johnston*, 334 U.S. 266 (1948). Rather, the district court has discretion to determine whether a prison inmate can attend court proceedings in connection with an action initiated by the inmate, and we review the district court's decision to conduct the trial by videoconference for an abuse of discretion. *See Stone*, 546 F.2d at 735.

In *Stone*, we counseled that the lack of a constitutional right to attend a civil action did not warrant summary exclusion of an inmate plaintiff from his trial. 546 F.2d at 730. "Rather the trial court must weigh the interest of the plaintiff in presenting his testimony in person against the interest of the state in maintaining the confinement of the plaintiff-prisoner." *Id.*

Clearly, a jury trial conducted by videoconference is not the same as a trial where the witnesses testify in the same room as the jury. Videoconference proceedings have their shortcomings. "[V]irtual reality is rarely a substitute for actual presence and . . . even in an age of advancing technology, watching an event on the screen remains less

than the complete equivalent of actually attending it." *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir. 2001). "The immediacy of a living person is lost" with video technology. *Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir. 1993). As the court in *Edwards v. Logan*, 38 F. Supp. 2d 463 (W.D. Va. 1999), observed, "Video conferencing . . . is not the same as actual presence, and it is to be expected that the ability to observe demeanor, central to the fact-finding process, may be lessened in a particular case by video conferencing. This may be particularly detrimental where it is a party to the case who is participating by video conferencing, since personal impression may be a crucial factor in persuasion." 38 F. Supp. 2d at 467.

Despite the limitations videoconferencing provides, challenges to videoconference proceedings have been rejected in other civil contexts. *See Rusu v. U.S. I.N.S.*, 296 F.3d 316 (4th Cir. 2002) (rejecting challenge to asylum proceeding conducted by videoconference); *United States v. Baker*, 45 F.3d 837 (4th Cir. 1995) (same in civil commitment proceeding); *cf. Lawrence*, 248 F.3d at 301 (finding sentencing by videoconference violated Federal Rule of Criminal Procedure 43's requirement that criminal defendant be present at sentencing). No circuit court has yet published an opinion addressing the decision to conduct an inmate's civil rights trial by videoconference. *Cf. Edwards*, 38 F. Supp. 2d at 467 (grant by district court of state's request to conduct inmate's § 1983 claim by videoconference despite videoconferencing's shortcomings).

The PLRA does not prohibit the use of videoconferencing at trial. Nor does Federal Rule of Civil Procedure 43, which governs the taking of testimony at a civil trial. In fact, Rule 43 affirmatively allows for testimony by videoconference in certain circumstances, as it provides:

> In every trial, the testimony of witnesses shall betaken in open court, unless a federal law, these

> rules, the Federal Rules of Evidence, or other rules adopted by the Supreme Court provide otherwise. The court may, for good cause shown in compelling circumstances and upon appropriate safeguards, permit presentation of testimony in open court by contemporaneous transmission from a different location.

The Advisory Committee Notes to this rule recognize the shortcomings of contemporaneous transmission and emphasize the importance of presenting live testimony in court.[2]

The limitations videoconferencing presents demonstrate that the decision to deny a prisoner the opportunity to be physically present at a civil rights trial he initiates is not one that should be taken lightly. Nonetheless, this decision remains within the district court's discretion, and our recognition of videoconferencing's limitations does not mean that Thornton was denied due process. In this case, we find that the district court did not abuse its discretion in conducting the trial by videoconference.

First, we cannot say the district court abused its discretion in finding good cause to conduct the trial by

---

[2] The Advisory Committee Notes to the 1996 amendment to Federal Rule of Civil Procedure 43 state in part:

> Contemporaneous transmission of testimony from a different location is permitted only on showing good cause in compelling circumstances. The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition. Transmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial.

videoconference. The district court considered the sworn testimony of a prison casework supervisor who testified that Thornton was classified as an "extremely high escape risk." Moreover, the supervisor testified that Thornton was already serving a life sentence, was only thirty-four years old, had a "moderate aggression level" and was housed in a unit with other inmates who had high to moderate aggression levels. She stated that under these circumstances, at least two officers, one of whom was a lieutenant, would be needed to escort him to court. At the time, Thornton was housed at a corrections facility approximately 120 miles from the courthouse. In addition to these concerns, the district court considered the approximately twenty persons from the Department of Corrections listed as potential witnesses, including both inmates and employees, and noted that these witnesses were "scattered all over the state."

Appropriate safeguards were also in place during the trial. The jury, seated in the courtroom, viewed a four-way screen that showed the judge, Thornton, the witness,[3] and the defendants' counsel. Thornton and the jury were also able to see and hear everyone at the same time. Each witness testified under oath and was subject to cross-examination.

In addition, because Thornton was acting *pro se*, he did not have counsel forced to choose between being in the same room as his client and thus not in the same room as the judge and jury, or remaining in the courtroom with the judge and jury and thus unable to confer in person with his client. *Cf. Rusu*, 296 F.3d at 323. We also note the relatively straightforward nature of his claim that he had been denied

---

[3] The jurors could watch the testimony of each witness on the screen with the exception of Warden Schomig, who testified by telephone from Nevada.

yard exercise privileges such that his right to freedom from cruel and unusual punishment was violated.

Finally, Thornton has not identified anything he was unable to do via videoconference that he could have done had he been physically present in the courtroom. He presented twelve witnesses, including himself. In addition, he delivered an opening and closing statement, offered other evidence, and cross-examined witnesses. Moreover, although he points to minor technical issues, the record reflects that they were small in number and quickly resolved. In this case, then, we cannot say that the district court abused its discretion in conducting the trial by videoconference.

## III.  CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment on Thornton's cell conditions claims. We AFFIRM the judgment in favor of the defendants on his denial of yard exercise claim.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*