In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1018

ROBERT WILLIAMS,

*Plaintiff-Appellant*,

*v.*

WEXFORD HEALTH SOURCES, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 17-cv-1466-JBM — **Joe Billy McDade**, *Judge*.

ARGUED FEBRUARY 26, 2020 — DECIDED APRIL 30, 2020

Before WOOD, *Chief Judge*, and ROVNER and BARRETT, *Circuit Judges*.

WOOD, *Chief Judge*. Wexford Health Sources, Inc., has a contract to provide medical services for Illinois's prisons. This case concerns the efforts of one inmate, Robert Williams, to obtain corrective surgery for cataracts during the time he was assigned to the Pontiac Correctional Center. In a word, those efforts were unavailing, because Wexford had a "one good eye" policy, under which it refused to approve surgery as

long as the inmate retains some visual acuity in one eye. Wil-
liams filed grievances with the institutional authorities and
followed up with this lawsuit. The district court found that
his efforts to exhaust his prison remedies were incomplete,
and so it dismissed the case. We conclude, however, that Wil-
liams did enough to satisfy the exhaustion requirements of
the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a),
and so we remand for further proceedings.

**I**

Given the fact that our focus is on procedure, we do not
need to say much about the underlying facts. In 2011, Wil-
liams was diagnosed with a cataract in his left eye. As time
went on, his vision deteriorated until he was completely blind
in that eye. Moreover, he experienced other symptoms, in-
cluding dizziness, acute pain, photophobia, and the feeling
that grit or some other foreign substance was in his eye. As
early as 2011, his doctors recommended cataract extraction
surgery for the left eye. They warned that without this opera-
tion (a common one), they would be unable to detect other
vision-threatening conditions such as glaucoma.

Wexford refused to authorize the surgery, based on its
"one good eye" policy. That was a dubious decision. In fact,
after his 2011 diagnosis of the cataract in his left eye, Williams
developed serious problems with his right eye. After an ex-
amination on February 12, 2016, doctors diagnosed a right-
eye cataract and a possible macular hole and vitreomacular
traction, along with the persistent left-eye cataract. Several
weeks after that visit, which was with an optometrist, Wil-
liams saw a specialist at Illinois Retina; that specialist also rec-
ommended cataract extraction.

At an examination on August 5, 2016, doctors found no vision in Williams's left eye and cataracts in both eyes. Still he did not qualify for surgery under Wexford's policy, because he was not yet blind (or nearly so) in the right eye.

On February 22, 2016, Williams filed his first grievance about Wexford's failure to treat his vision. He completed the "Offender's Grievance" form provided by the Illinois Department of Corrections (IDOC), explaining that he sought compensation for Wexford's deliberate indifference, and he checked a box indicating that his was an emergency grievance. Pontiac's warden received and reviewed this grievance. He responded by checking a box with the pre-printed statement "No; an emergency is not substantiated. Offender should submit this grievance in the normal manner." Williams asserts that he appealed the warden's decision to the Administrative Review Board (ARB). At the district court level, Wexford did not dispute this fact, but before this court, it says for the first time that Williams did not file an appeal. In the district court, Williams represented that he received a response from the ARB denying his grievance, but he now (through recruited counsel) states that he did not receive a response to his appeal. We return to these discrepancies later.

Williams filed a second grievance on August 5, 2016. In it, he again complained that Wexford's response to his deteriorating vision amounted to deliberate indifference. He sought cataract extraction surgery for his left eye, treatment for his right eye, and compensation for his pain and suffering. Once again, he indicated that the grievance involved an emergency, and once again, the warden disagreed and checked the box with the statement that the Offender "should submit this grievance in the normal manner." This time it was clear that

Williams lodged an appeal with the ARB. The Board received
the appeal, but it returned the grievance to Williams without
expressing a view on the merits. Instead, it checked boxes on
a form indicating that Williams had not satisfied the require-
ments of the *standard* procedure, telling him that he was re-
quired to provide responses from his counselor, the Griev-
ance Officer, and the Chief Administrative Officer. It did not
tick the box that was available for simple requests for addi-
tional information.

At that point Williams filed a *pro se* complaint under 42
U.S.C. § 1983 in the federal district court. In both his original
complaint and his amended complaint, he verified that he had
completed the grievance process. Wexford answered the
amended complaint and moved for summary judgment, con-
testing that assertion. It said nothing about Williams's Febru-
ary 22 grievance, but it admitted that he had filed the August
5 grievance. It argued that this was not enough to exhaust his
remedies, however, because Williams did not follow up with
the requested additional documentation after the warden
concluded that it was not an emergency. The district court
was persuaded by Wexford's argument and held that because
Williams "did not file a standard grievance after the two
grievances were denied emergency status," he had failed to
exhaust.

## II

Although there is no general exhaustion requirement for
cases brought under 42 U.S.C. § 1983, a special rule applies to
actions brought by prisoners. See, *e.g.*, *Porter v. Nussle*, 534
U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). The
PLRA directs that "[n]o action shall be brought with respect
to prison conditions under section 1983 of this title, or any

other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has emphasized that prisoners must take advantage of all procedures that are actually available. *Ross v. Blake*, 136 S. Ct. 1850 (2016). We look to state law to see what remedies meet that test. See *Woodford v. Ngo*, 548 U.S. 81 (2006); *King v. McCarty*, 781 F.3d 889, 894 (7th Cir. 2015).

Illinois offers two paths for inmates who wish to complain about something. First, it has created a three-stage process for normal problems. See 20 Ill. Admin. Code § 504.800 *et seq.* As we noted in *Pyles v. Nwaobasi*, 829 F.3d 860 (7th Cir. 2016), step one calls for the inmate to attempt to resolve the problem through his or her counselor. *Id.* at 864. "If that does not resolve the problem, the inmate must invoke step two, which involves the filing of a written grievance with a grievance officer … within 60 days after discovery of the problem." *Id.* If the grievance officer denies the grievance and the chief administrative officer (normally the warden) affirms that decision, then the inmate must move to step three, which is an appeal to the IDOC's director, who relies on the review and recommendations of the ARB. *Id.* (In the interest of both realism and ease of exposition, in the remainder of this opinion we refer to the chief administrative officer as the warden.)

A different procedure is available for emergency grievances. When an inmate believes that he confronts an emergency situation, state law permits him to bypass the counselor and grievance officer and submit his grievance directly to the warden. See 20 Ill. Admin. Code § 504.840. An emergency is defined as an issue presenting "a substantial risk of imminent personal injury or other serious or irreparable harm to the

offender." *Id.* If the warden finds that the grievance describes such a problem, he will authorize an expedited process. *Roberts v. Neal*, 745 F.3d 232, 236 (7th Cir. 2014). If the emergency petition goes forward, the inmate may appeal the warden's decision to the ARB on an expedited basis. See 20 Ill. Admin. Code § 504.850(f).

At the time Williams filed his two grievances in 2016, the Illinois Administrative Code did not expressly address what should happen if the warden concludes that the grievance does *not* present an emergency. Could the inmate challenge that assessment? Was the inmate required to provide additional information about why the grievance required emergency treatment? Did the inmate need to start over again with the standard procedure? In 2017, the Code was amended to fill in this gap. It now provides that "[i]f the Chief Administrative Officer determines that the grievance should not be handled on an emergency basis, the offender shall be notified in writing that he or she may resubmit the grievance as non-emergent, in accordance with the standard grievance process." 20 Ill. Admin. Code § 504.840 (2017). Thus, had Williams's grievances been filed after the amendment took effect, it would be clear that he was required to resubmit his grievances under the normal procedure and complete the full three-stage process in order fully to exhaust available remedies. The question we must decide is whether the pre-amendment version of the Code imposed such an obligation.

This issue is presented more sharply with respect to the August 5 grievance than it is for the February 22, 2016, grievance. The problem with the February grievance is, in a word, waiver. Wexford concedes that Williams filed the February grievance, and that he marked it as an emergency. Indeed,

Williams attached the February grievance to his original and amended complaints. For reasons best known to itself, Wexford ignored it in the district court—an omission that Williams noted in his summary judgment briefing. In this court, Wexford is now arguing that Williams failed to appeal the warden's decision that the February grievance was not an emergency to the ARB and thus he cannot rely on it for exhaustion purposes. But it is too late for that point. Wexford has waived any argument it might have wanted to make about the February grievance. (This is not a case in which exhaustion can be disregarded, see 42 U.S.C. § 1997e(c)(2), because in its initial merit review of the complaint, the district court declined to dismiss it for failure to state a claim, frivolousness, or related grounds.)

The record is cleaner for the later, August grievance. Williams again marked it as an emergency; the warden again decided that it was not; and Williams attempted to appeal that determination to the ARB. As we noted earlier, the regulations in effect in 2016 did not provide for an appeal of such an order. Nor does the ARB seem to have thought that it was reviewing the warden's decision about the emergency nature of the grievance. Instead, the ARB responded by informing Williams that his appeal was missing the materials that would have been required under the standard procedure: the written Offender's grievance, the counselor's response, and the Grievance Officer and warden's responses. Importantly, the ARB did *not* mark the box saying "[u]nable to determine nature of grievance or correspondence; submit additional specific information. …" What it did instead was to create a new procedural requirement for Williams—namely, to go back and recommence the grievance process under the standard procedure. It did so without explaining how relevant time limits

might be affected, and it did so without any basis for such a step in the regulations.

We faced a similar problem in *Thornton v. Snyder*, 428 F.3d 690 (7th Cir. 2005). Inmate Thornton, who had been placed in a segregation cell, filed an emergency grievance about the conditions there. In response, he received a letter stating that his grievance did not qualify as an emergency; later he was moved to another cell. Without refiling his grievance under the standard procedures, Thornton brought a lawsuit seeking damages for the time he spent confined in the segregation unit. Responding to the argument that he had failed to exhaust his remedies, we had this to say:

> There is nothing in the current regulatory text, however, that requires an inmate to file a new grievance after learning only that it will not be considered on an emergency basis. In any event, even if the non-emergency determination was a decision that should have been appealed, corrections officials moved Thornton out of [the cell] within three weeks of his … grievance, before the thirty-day time for an inmate to appeal a warden's determination had expired.

*Id.* at 694. We concluded that Thornton had done enough to exhaust his administrative remedies even without resubmission.

Williams pointed out in his briefs and at oral argument that we have followed *Thornton* in a number of non-precedential decisions, including *Muhammad v. McAdory*, 214 F. App'x 610 (7th Cir. 2007), *Glick v. Walker*, 385 F. App'x 579 (7th Cir. 2010), *Bentz v. Ghosh*, 718 F. App'x 413 (7th Cir. 2017), and *Cobian v. McLaughlin*, 717 F. App'x 605 (7th Cir. 2017). All of

these cases held that under the version of section 504.840 that existed before the 2017 amendment, an Illinois inmate who filed an emergency grievance did not need formally to resubmit his complaint as an ordinary grievance if the warden concludes that it did not present an emergency. One can easily imagine why that might be so: it would be easy enough for the warden to transfer the presumptively non-emergency grievance back to the counselor and allow the full standard procedure to unfold, without placing that burden on the inmate and endangering the timeliness of his filing. But those possibilities are not explored in these non-precedential dispositions, and (as is typical for such orders) they are more summaries than fully reasoned explanations. We prefer for present purposes to stick to more authoritative sources.

When we do so, we find several reasons to conclude that Williams did enough under the 2016 version of the Code to exhaust his remedies. First, before the 2017 amendment, nowhere in the Code did it say that an inmate who invoked the emergency process in a non-frivolous way had to start all over again with the standard procedure whenever the warden concluded that no emergency existed. Although a prisoner must take all the steps the prison offers, see *Ngo*, 548 U.S. at 90 (citing *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)), and do so properly, *id.*, this does not mean that the inmate must go beyond the established system and guess at some other way of attracting the attention of the prison authorities. Second, this is a procedural matter of great importance, both for the state and for the PLRA. Grievance procedures must be transparent. This helps everyone: the institution is better able to investigate and resolve grievances if they are presented under a well-understood system, and inmates are better able to comply with institutional expectations if the rules are clear.

The Supreme Court underscored this point in *Ross*, where it held that "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." 136 S. Ct. at 1859. If the warden or the ARB can make up new exhaustion rules for each individual inmate, predictability would be lost.

We observed in *Thornton* that the regulatory text did not "require[] an inmate to file a new grievance after learning only that it will not be considered on an emergency basis." 428 F.3d at 694. Even if we regard this statement as *dicta*, on the ground that we added that Thornton himself did not have enough time to file an appeal of the non-emergency determination, it is an accurate description of the Illinois regime at the time. Moreover, Williams did have time and did try to file an appeal of the non-emergency determination of his grievances, and he failed. We thus conclude that Williams exhausted the remedies that were available to him, as *Ross* required him to do.

Other circuits have considered failure-to-appeal scenarios, but their decisions are distinguishable. For example, in *Bargher v. White*, 928 F.3d 439 (5th Cir. 2019), the Fifth Circuit evaluated a case brought by Inmate Bargher, who was complaining about a vicious assault from another inmate and the Louisiana prison's failure to protect him from a known danger. Bargher filed a grievance about the incident with the warden, as required by Louisiana law, but when he did not hear from the warden within the 40-day period established by law, he filed his lawsuit. The court pointed out, however, that the grievance system provided that the inmate should proceed to the second step and file an appeal with the Secretary of the Louisiana Department of Public Safety and Corrections if the 40-day period ended with no response. Because Bargher did

not do so, the court concluded, he failed to take advantage of all remedies the prison made available. The particulars of the Louisiana system drove this finding. Williams's case is different in at least two respects: first, there was nothing that Illinois law offered him that he did not use; and second, Illinois law itself is different from the regulations Louisiana has elected to adopt.

A case from the Third Circuit, *Shifflett v. Korszniak*, 934 F.3d 356 (3d Cir. 2019), further illustrates how important the differences among state procedures can be. This was a case in which the inmate, Shifflett, was attempting to bring a claim for deliberate indifference to a serious medical need. The district court found a failure to exhaust, but the Third Circuit saw matters otherwise. Shifflett had filed four grievances, but all of them were denied. He appealed all four denials, but he did not receive a timely answer on the merits to any of them. Under the applicable law, the prison was supposed to respond to an appeal within 15 working days after it was filed, but it did not do so. The court ruled that as of the due date for the response, Shifflett had done all he could, and he was thus entitled to bring his lawsuit. *Id.* at 366. Once again, both the facts in Williams's case and the law are different. Williams's problem was not the lack of *any* response. It was the lack of a mechanism under Illinois law to appeal the determination that his case did not present an emergency, along with the lack of any obligation under the pre-2017 version of the regulations for him to take the initiative and re-file the grievance as an ordinary case.

### III

This case is not going to have a particularly great impact on the way in which Illinois runs its prisons, thanks to the

2017 amendments to the regulations. But it does make a difference to Williams. As *Ross* holds, he was obliged to follow whatever administrative remedies were available to him, but that is where his obligation ended. The competent authorities, including the warden and the ARB, did not have the right to move the goal posts while Williams was in the middle of his case and suddenly announce that special new requirements applied to him.

And let us be clear: Williams's assertion that his grievance was an emergency was not frivolous, even though a reasonable person may have disagreed with that characterization. A frivolous assertion of emergency would present an entirely different problem. So would a case in which the ARB simply asked for additional information related to the grievance, as it might have done (but did not) here. That largely answers Wexford's stated concerns—that all inmates would simply avoid the standard procedure by claiming an emergency, or that the warden or ARB would be unable to collect pertinent information. In addition, to the extent that IDOC wanted to avoid problems that are less easily resolved, its remedy was exactly what it did: amend the regulations.

We therefore REVERSE the judgment of the district court and remand for further proceedings consistent with this opinion.

BARRETT, *Circuit Judge*, concurring in the judgment. Administrative exhaustion under the Prison Litigation Reform Act (PLRA) is an affirmative defense, so the defendant bears the burden of showing that the plaintiff failed to exhaust. *Jones v. Bock*, 549 U.S. 199, 212 (2007); *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). At oral argument, Wexford stated that if the Administrative Review Board had denied Williams's appeal of his emergency grievance determination without comment, then Williams would have exhausted all of his available administrative remedies. That is enough to resolve this appeal, and I would reverse the district court's judgment on that ground.

I write separately because in my view, the majority's reasoning conflicts with the Supreme Court's interpretation of the PLRA.[1] The majority's holding turns on the fact that the 2016 Illinois Administrative Code did not expressly say that an inmate should file a standard grievance if the prison decided that his emergency grievance did not warrant fast-track treatment. In the absence of such an explicit instruction, the majority holds, Williams's filing of the emergency grievance was enough to satisfy the PLRA's exhaustion requirement. It was reasonable for Williams to believe that he didn't have to do anything more.

---

[1] This is so even though Wexford opted not to press the point. It's unclear why Wexford dropped the defense, and it's possible that Wexford's choice rested on a misunderstanding of what it means for a remedy to be "available" under the PLRA. Even so, my analysis wouldn't change. Wexford's choice to drop an affirmative defense is controlling, but its interpretation of the PLRA is not. *See Krieger v. United States*, 842 F.3d 490, 499 (7th Cir. 2016) ("Of course we are not bound to accept [a party's] concession when the point at issue is a question of law.").

But in *Ross v. Blake*, the Supreme Court held that so long as additional remedies are "available" to a prisoner, "the PLRA's text suggests no limits on an inmate's obligation to exhaust." 136 S. Ct. 1850, 1856 (2016). A straightforward reading of the Illinois regulations suggests that Williams had an additional avenue available to him: the standard grievance procedure. And that's true even though § 504.840 did not explicitly require him to resubmit his grievance through the standard procedure. The "availability" of the remedy doesn't turn on whether the regulations directed Williams to use it—the alternative was available so long as it remained at Williams's disposal. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

Williams does not dispute that the normal grievance procedure was "available" to him in this sense. *See Ross*, 136 S. Ct. at 1859 (stressing that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of'" (citation omitted)). For example, he does not contend that the normal grievance procedure "operate[d] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Nor does he claim that the prescribed process was "so opaque that it [was], practically speaking, incapable of use." *Id.*; *see also id.* (explaining that "when a remedy is … essentially 'unknowable'—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable" (citation omitted)). Nor does he say that prison administrators misrepresented what was required of him, thereby "thwart[ing]" his efforts to file a grievance. *Id.* at 1860 (explaining that a remedy is unavailable when administrators "devise procedural systems" designed "to trip[] up all but the most skillful prisoners" (citation and internal quotation

marks omitted)). Instead, his contention, which the majority accepts, is that the silence in the prison regulations made it reasonable for him to think that he didn't have to use the standard grievance procedure.

The problem is that the Court rejected this very argument in *Ross v. Blake*. There, the inmate contended that he had not pursued a remedy through the usual process because he thought the investigative process in which he had participated "served as a substitute for that otherwise standard process." *Id.* at 1855. The Court held that such a mistake, even if reasonable, did not render the standard process exhausted. *Id.* at 1858. Indeed, the Court could not have been more explicit that the PLRA contains no exception for "cases in which a prisoner makes a reasonable mistake about the meaning of a prison's grievance procedures." *Id.*

It's true that *Thornton v. Snyder* contains dicta to the contrary. 428 F.3d 690, 694 (7th Cir. 2005). (Like the majority, I put our nonprecedential decisions aside.) The majority's reliance on *Thornton* is misplaced, though, and not only because the relevant language is dicta. *Thornton* preceded *Ross v. Blake* by more than a decade. Whatever we may have said about the issue before *Ross v. Blake* was decided, the Court has now given us different marching orders. And, of course, as an inferior court, we are bound to follow them.

The majority observes that recent amendments to the Illinois Code blunt the significance of this opinion. But that is only true as to Illinois—we have no information about Wisconsin and Indiana law, so the case may well matter for the other states within our jurisdiction. Regardless, if the case truly lacks long-term impact, it would have been better for us to resolve it on the basis of Wexford's concession. Because I

think the majority's resolution conflicts with *Ross v. Blake*, I concur in the judgment only.