In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1229

JOHN W. PEROTTI,

*Plaintiff-Appellant*,

*v.*

DIANE QUINONES and
BILLIE KELSHEIMER,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:10-cv-00086-JMS-MJD— **Jane E. Magnus-Stinson**, *Judge.*

ARGUED FEBRUARY 9, 2015 — DECIDED JUNE 22, 2015

Before ROVNER and SYKES, *Circuit Judges*, and WOOD, *District Judge.**

ROVNER, *Circuit Judge.* After a one-day trial, a jury rejected federal prisoner John Perotti's claim that his promotion from

---

* The Honorable Andrea R. Wood, of the Northern District of Illinois, sitting by designation.

education orderly to law clerk was delayed in retaliation for his history of filing administrative grievances. Perotti appeals, contending that the district court abused its discretion in denying his petition for a writ of habeas corpus ad testificandum and instead arranging for him to participate in the trial by video conferencing. At the least, Perotti suggests, the district court should have ordered all parties to appear by video conferencing rather than imposing that disadvantage solely on him. Finding no abuse of discretion in the court's decision, we affirm the judgment.

## I.

A. Background

In 2005, a federal jury in the Northern District of Ohio convicted Perotti on the charge that he had unlawfully possessed ammunition in interstate commerce after having been previously convicted of a felony. *See* 18 U.S.C. § 922(g)(1). Finding that Perotti's prior convictions qualified him as an armed career criminal, *see* 18 U.S.C. § 924(e), the district judge ordered him to serve a prison term of 210 months.

Perotti was housed at the federal penitentiary at Terre Haute, Indiana, for a two-year period beginning in April 2008. Following his orientation at the Terre Haute facility, he found employment as an orderly in the prison's education department, commencing on April 24. In addition to providing classroom instruction to inmates, the education department houses and oversees the prison's leisure and law libraries. As an orderly, Perotti would have been responsible for a variety of janitorial tasks in the department. Orderlies and other staff were supervised by the department's instructors.

Perotti alleged that in August 2008, defendant Billie Kelsheimer, one of the instructors in the education department, offered him a promotion to the position of law clerk, in which capacity he would assist other prisoners with legal research. He accepted the new position, only to be told later by Kelsheimer that defendant Diane Quinones, the department administrator, had disapproved the promotion because Perotti had filed too many grievances against the department. Only after associate warden Bonita Mosley intervened at his request was he finally given the new position, which he officially assumed as of September 17. Based on these allegations, Perotti claimed that Quinones and Kelsheimer, by rescinding or delaying the promotion until Mosley intervened, had retaliated against him for exercising his First Amendment right to pursue grievances through the prison's administrative remedies system.

Perotti's tenure as a law clerk ultimately proved to be quite short. He was removed from the position in early October 2008, after another instructor, Laura Wheeler, filed a misconduct report averring that Perotti had possessed another inmate's legal materials outside of the library, in violation of prison rules. He was ultimately vindicated on that charge and awarded back pay, but he was not reinstated to the law clerk position nor given any other job for the remainder of his stay at Terre Haute. He was transferred to a different facility in April 2010.

B. Complaint and pre-trial proceedings

Perotti filed suit against Quinones, Kelsheimer, and Wheeler under *Bivens v. Six Unknown Named Agents of Fed.*

*Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971), alleging that they unlawfully retaliated against him for the exercise of his constitutional rights—Quinones and Kelsheimer, by initially excluding him from the law clerk position for having filed too many administrative grievances, and Wheeler, for having him fired for assisting another prisoner with his legal case. The suit was originally filed in state court, but was removed to federal court by the defendants. The district court initially granted summary judgment to all three defendants. *Perotti v. Quinones*, 2011 WL 4346397 (S.D. Ind. Sept. 16, 2011).[1]

In a prior appeal, we upheld the grant of summary judgment to Wheeler, reasoning that because Perotti had no constitutional right to provide legal assistance to other prisoners, he had no viable claim of retaliation against her for initiating his discharge. *Perotti v. Quinones*, 488 F. App'x 141, 146 (7th Cir. 2012) (non-precedential decision). But we vacated the judgment as to Quinones and Kelsheimer, concluding that questions of fact entitled Perotti to a trial as to whether they had barred (or temporarily removed) him from the law clerk position in retaliation for having filed grievances against the education department, in violation of his First Amendment rights. *Id.* at 145.[2]

---

[1] Our citations to the district court's orders reflects the correct spelling of Quinones's name.

[2] Whether the promotion offered to Perotti was initially granted and then rescinded, or whether it was not implemented at all until after he complained that he was the victim of retaliation—both theories have been floated at various times during the litigation—is immaterial at this juncture.

(continued...)

On remand, the district court appointed counsel for Perotti. That attorney served written discovery, deposed both Quinones and Kelsheimer, and defended Perotti's deposition, among other tasks. However, roughly two months prior to trial, Perotti filed an *ex parte* request asking for the court's leave to assume responsibility for his own representation in light of a breakdown in the attorney-client relationship. The court granted that motion and allowed Perotti's counsel to withdraw.

One of counsel's last acts on behalf of Perotti was to file a motion asking the court to issue a writ of habeas corpus ad testificandum pursuant to 28 U.S.C. § 2241(c)(5) directing the Bureau of Prisons to produce Perotti for trial. At that time and through the conclusion of the trial, Perotti was incarcerated at the federal penitentiary in Fairton, New Jersey. Perotti was thus asking the court to order his transport to Indiana. The United States Attorney, on behalf of the Bureau of Prisons and the United States Marshals Service, filed a memorandum opposing the motion, citing the expense, logistical burden, and security risk posed by relocating Perotti to Indiana for trial.

In a written entry, the court denied Perotti's request for a writ securing his presence at the forthcoming trial. *Perotti v. Quinones*, 2013 WL 4008188 (S.D. Ind. Aug. 5, 2013). As guideposts for the exercise of its discretion as to the relief Perotti was requesting, the court looked to the factors we articulated in *Stone v. Morris*, 546 F.2d 730, 735-36 (7th Cir.

---

[2] (...continued)

For the sake of simplicity, we shall simply characterize the alleged retaliation as the denial of a promotion.

1976), while having in mind that Perotti could participate in the trial by video conferencing rather than in person.

The court took note of multiple factors that weighed against granting the writ. First, the issue to be resolved at trial was straightforward and required the testimony of relatively few witnesses, the quantity of any lost wages was small, and, although an award of punitive damages was possible, the court was aware of no evidence supporting such an award. 2011 WL 4008188, at *2-*3. Second, Perotti was implicitly asking the government to bear the expense of his transport, and the United States Marshals Service had lodged an objection to his transfer. The fact that Perotti had previously been transferred among various federal facilities on multiple occasions, as he pointed out, did not mitigate the expense his production for trial would entail. *Id.*, at *3. Relatedly, Perotti had been classified as having a history of serious violence, and his transport would require extreme caution. *Id.*, at *4. Finally, as to suitable alternatives, the court deemed a delay of the trial until the conclusion of Perotti's prison term (when he could appear in person without a writ) to be unrealistic, as his release would not occur until 2019 at the soonest. *Id.*

However, having Perotti appear by video was a realistic alternative to his physical presence at trial. Without question, Perotti had an interest in presenting his testimony in person. *Id.* Nonetheless, the court was convinced, based on Perroti's appearance by video at a recent pretrial conference, that this was an acceptable alternative to ordering his appearance in person for trial. The court noted that Perotti's demeanor and facial expressions had been visible to everyone in the court-room at the pretrial conference, and that Perotti had been able

to see the judge, the jury box, defense counsel, and the witness stand. *Id.*, at *5. Furthermore, because Perotti was representing himself, having him appear by video did not pose logistical difficulties as to where his counsel should be and how he and his counsel might communicate. *Id.* In sum:

> Even with all shortcomings considered, video-conferencing nonetheless facilitates Perotti's meaningful participation at trial: he will be virtually present and able to testify, present evidence, confront witnesses and address the jury. Perotti argues that he will not prevail in this action if he is unable to appear in person. This Court, however, is convinced that if Perotti does not prevail in this civil action it will not be because he testified via video conference.

> The use of videoconferencing technology presents a reasonable alternative to Perotti's presence at court and strikes a proper balance between Perotti's interests and the countervailing concerns relating to cost and security associated with producing the plaintiff at trial.

*Id.* Separately, the district court ordered the Fairton, New Jersey penitentiary to make Perotti available for trial by video link.

## C. Use of video conferencing at trial

At the outset of jury selection, as the parties were being introduced, the court and Perotti jointly made the venire members aware that he was incarcerated in Fairton, New

Jersey, and would be appearing by closed-circuit television, R. 14 at 45-46, but thereafter the court said nothing more to the jury on that subject. Given the nature of Perotti's claim (that prison employees had denied him a promotion in retaliation for having pursued too many grievances), the jury necessarily would have understood that he was incarcerated. Although Perotti suggests that the jury must have wondered why he alone participated in the trial by video, he does not quarrel with the court's brief statement as to his location, nor does he argue that the court should have given the jury any cautionary instruction with respect to his status as a prison inmate or the fact that he was not physically present in the courtroom.

The video feed from Perotti's place of incarceration was displayed on a 42-inch monitor in the courtroom, the size of which permitted everyone in the court, including the jury, to see his facial expressions. With the exception of a brief interruption in the feed which we describe below, there is no indication that anyone in the courtroom had any difficulty seeing, hearing, or understanding Perotti.[3] Of course, Perotti, not having been present in the courtroom (and not having had his own advocate in the courtroom), would have no first-hand knowledge of any shortcomings in this regard. But given how conscientious the district judge was in making sure that Perotti could see and hear as much of the trial and the trial participants as the video conferencing set-up permitted, we are confident that the judge would have noted and corrected any

---

[3] Defense counsel, on commencing her cross-examination of Perotti, stated, "I would like to note for the record that I can see you and hear you clearly this morning. I can see your eyes and your facial expressions." R. 14 at 97.

problems the system posed for those present in the courtroom. *See* R. 14 at 97 (court confirmed that jurors could see Perotti and instructed them to raise their hands if they could not).

The simultaneous video feed from the courtroom to Perotti was displayed on a smaller, 16-inch monitor at the prison facility. We gather from the record that Perotti's monitor displayed a single view of courtroom that initially included the judge, jury, and witness chair. The camera and microphone transmitting the courtroom proceedings to Perotti evidently were located in or on the courtoom video monitor itself; and the trial transcript reflects that the position of that monitor was adjusted at times in order to redirect the camera and thereby facilitate Perotti's view. *See, e.g.,* R. 14 at 67, 96.

During jury selection, the court had the venire members sit on folding chairs in the well of the courtroom so that they were visible to Perotti during questioning. Before the process of jury selection got underway, the court had its courtroom deputy clerk sit in one of the folding chairs in order to ascertain how well Perotti could see her. When Perotti complained he could not see the clerk's facial features or expression, the court adjusted the lights in the courtroom in order to facilitate a better view. After the jury had been selected and seated in the jury box, and Perotti indicated that he could not see the jurors' faces, the court had the video monitor moved two feet closer to the jury box and had the jurors sit closer to one another and at one end of the jury box so as to give Perotti a better view.

Later in the proceeding, after Perotti had concluded his testimony and before his second witness took the stand, the court had its clerk sit in the witness chair to confirm that

Perotti could see her. When Perotti indicated that he could not make out her facial expression, the court decided to have the witnesses give their testimony from a folding chair on the floor of the courtroom rather than the raised witness box so that Perotti would have a better view of the witnesses and the other participants. When the deputy clerk took a seat in the folding chair to test out the new arrangement, Perotti confirmed that he could "see her smiling." R. 14 at 68. Perotti did not thereafter complain that he could not see a witness adequately. And when the time came for defense counsel to examine or cross-examine a witness, counsel would stand slightly behind the witness while questioning her, so that Perotti could see both the witness and counsel at once.

Despite the court's best efforts, there were at least some limitations on what Perotti could see. At no time during the trial was Perotti able to see the entire courtroom. Perotti voiced that point early on during the trial, noting that he could not see the defense table, but the court indicated that it was "impossible" to accommodate his wish to see the whole courtroom. R. 14 at 67. Perotti also remarked on multiple occasions during the trial that he could not see the jurors' facial expressions.[4] And because the courtroom video monitor was re-positioned during witness testimony so as to present Perotti with the best possible view of both the witnesses and the jury, Perotti was not able to see the judge while witnesses were testifying.

---

[4] On one occasion, Perotti remarked that the jury appeared to be distracted, which the defendants cite as proof that he could, in fact, see their facial expressions. We shall assume, nonetheless, that Perotti in fact was not able to make out the facial expressions of individual jurors.

Finally, Perotti remarked in his closing statement to the jury that he had difficulty seeing the faces of the other witnesses as well as those of the jurors, and his counsel has made the same representation on appeal. But we reiterate that Perotti only once indicated to the court that he could not see a witness's facial expression, and that was before Mosley, the first witness to testify after Perotti, began her testimony. It was just before Mosley took the stand that Judge Magnus-Stinson had her deputy clerk sit in the witness box to confirm that Perotti could see her adequately; and when Perotti said that he could not, the judge decided to have the witnesses testify from a folding chair on the courtroom floor rather than the witness stand. When the judge's clerk sat on the folding chair, Perotti noted that he could see the clerk smiling, which confirms that he could observe her demeanor. And after that point, Perotti never informed the court that he had any trouble observing a witness's facial expressions, whereas he did raise other objections to what he could not see. So we discount the notion that Perotti's observation of the witnesses was unduly limited.

At one point, while the court was giving the jury its final instructions before deliberations began, the video and audio link to Perotti was lost. The court excused the jury from the courtroom until the connection was restored, ascertained the last instruction that Perotti had heard the court give to the jury, and resumed the instructions from there.

At the conclusion of the one-day trial, the court memorialized its impressions of the video conferencing arrangement:

> The Court found the video capabilities to be adequate. Mr. Perotti was able to meaningfully partici-

pate at trial. He was virtually present and able to testify, present evidence, confront witnesses and address the jury. Mr. Perotti's facial expressions and demeanor were clearly visible to the Judge, Jury, Defendants, and Defendants' Counsel. Courtroom furnishings were moved so that Mr. Perotti could observe the witnesses [and] opposing counsel during questioning and the jury.

R. 213 at 4.

D. Evidence presented at trial.

Perotti was the first and principal witness to testify in support of his case, and his testimony was consistent with the allegations we outlined above. He testified that on or about August 21, 2008, Kelsheimer asked him if he would be interested in a promotion to an open law clerk position and he accepted the position. After working at the new job for two weeks, he noticed that his pay had not increased—law clerks were compensated at the rate of 29 cents per hour as opposed to the 12 cents an hour that orderlies received—and that the library job roster did not yet reflect the change in his status. When, on September 9, he asked Kelsheimer about the discrepancy, she said that "Miss Quinones told her that I would not be changed over because of the fact that I filed too many grievances against the law library." R. 14 at 92. By way of background, Perotti testified that the Terre Haute facility had been on lockdown for much of the Spring and Summer of 2008, during which time prisoners were largely confined to their cells and were unable to use the law or leisure libraries. Even when the lockdown ended, a new meal schedule had interfered

with his use of the law library, which meant that he could not work on several civil matters that he then had pending. Perotti had filed an administrative grievance complaining of not having access to the law library's typewriters during that period and Quinones, although not named in the grievance, had been responsible for responding to that grievance in her capacity as supervisor of the education department. (Elsewhere in his testimony, Perotti noted he had filed a number of grievances while at Terre Haute, one or more of which concerned his work in the education department; and in her testimony, Mosley described Perotti as "a very litigious inmate." R. 14 at 134.)

After his conversation with Kelsheimer, Perotti had sent an informal communication known as a "cop-out" to associate warden Moseley, complaining that he was being punished for the exercise of his rights. Mosley, in turn, had asked Perotti to see her to discuss informal resolution of the matter. According to Perotti, Mosely instructed him to resume his work as a law clerk and assured him that he would be paid appropriately for the time he had already worked in the law clerk position. A prison "change sheet" indicated that Perotti's position was formally revised to that of law clerk as of September 17. Nonetheless, because Perotti, by his account, had commenced work as a law clerk in August, he believed he had been denied appropriate compensation for at least some period of time. By his own estimate, the additional amount he was owed was no more than $30, although this was not the focus of his concern, he told the jury.

> [L]ike I said, it is not really the money I am here for.
> It wasn't the money. It was the offense that it was –

the offense is I am in prison, and I am doing my time. And I, and I am trying to straighten my life out. I feel the people working here should be more an example than a negative example, a positive example, and I felt the fact the, that they did this, that they retaliated against me was a violation. I wasn't really worried about the money. I really wasn't.

R. 14 at 95.

On cross-examination, Perotti agreed that he had had no run-ins with either Kelsheimer or Quinones. He also admitted that he had no cause to think that either of them had any reason other than his prior grievance to harbor any animosity toward him. Still, he insisted on re-direct that it was plausible to believe that he had initially been denied the promotion to the law clerk position in retaliation for his history of grievances. Prison officials had a bias against the filing of complaints, he told the jury. "[W]hen somebody utilizes the administrative remedy system, quite often they get shunned, they lose their job. They have a lot of things done against them." R. 14 at 103.

Mosley, who, as the prison's associate warden for industries and education, oversaw the education department where Perotti was employed, recalled talking to Perotti about his cop-out, but denied telling him he could have the job back or ordering Kelsheimer or Quinones to promote or reinstate him to the law clerk position. Mosley did not recall what, if any, conversation(s) she may have had with Quinones or Kelsheimer regarding the situation. Mosley testified that she

typically would have spoken about such a complaint with Quinones and given her the opportunity to resolve it in the first instance; but Mosley would not have unilaterally assigned a job to a prisoner nor would she have instructed Quinones or Kelsheimer to put a prisoner into a particular position. From what little paperwork there was concerning Perotti's cop-out, Mosley assumed, in view of the change sheet indicating that Perotti was promoted to the law clerk position as of September 17, that the situation had been resolved by Quinones without her involvement: in particular, her note to Perotti asking him to see her about the cop-out was sent after that date. Mosley agreed that it was possible that she had discussed the cop-out with Perotti prior to September 17, but she could not recall whether in fact she had. Finally, Mosley testified that it was not at all unusual for an inmate to file many grievances. She did not remember any incident between Quinones and Perotti, nor could she recall "particularly that [Quinones] would have had any reason to retaliate against [Perotti]." R. 14 at 131.

At the conclusion of Mosley's testimony, Perotti rested. The defendants moved for the entry of judgment as a matter of law, which the district court denied. The defendants then proceeded with their case, which consisted of their own testimony.

Quinones denied having told Kelsheimer not to promote Perotti to the law clerk position. Quinones testified that she had no involvement with the decision whether to promote Perotti. She indicated that instructors in the education department handled inmate employment decisions on a rotating basis; and she did not know who was responsible for the decision as to Perotti. Quinones denied having retaliated against Perotti for any reason and further denied having any

reason to entertain retaliatory action. She testified that it was not uncommon for inmates to file many grievances, including grievances related to the education department (regarding typewriters, access to the libraries, and so forth). Responding to such grievances was among her responsibilities as the head of the department, and having to do so did not make her angry, she said—it was simply part of the job. She recalled generally that Perotti had complained about the library schedule and access to typewriters in the law library, but she was not named individually in his grievance, she did not specifically recall responding to his grievance, and again denied that she felt any anger over it. On cross-examination, Quinones also denied having had a conversation with Perotti in which he confronted her with Kelsheimer's alleged explanation about why he had not been promoted. In fact, she recalled Perotti only "very vaguely" (R. 14 at 149), and did not remember having had any problems with him.

Kelsheimer, too, denied any involvement with the decision to promote Perotti to the law clerk position or to deny him that position. She testified that she had never made a decision to promote an inmate from orderly to law clerk or to fire or demote an inmate. She thought it likely that the decision to promote Perotti to the law clerk position was made by the instructor who had hired him as an orderly, and that instructor was not Kelsheimer. Kelsheimer testified that she had not discussed Perotti's promotion with Quinones, denied that Quinones had told her not to promote him, and denied telling Perotti that Quinones had instructed her not to promote him. She said she had "no clue" as to any grievances Perotti might have filed against the education department. R. 14 at 180.

Kelsheimer acknowledged that she was responsible for processing inmate pay in the education department. Looking at the pertinent payroll records, she testified that Perotti was promoted to the law clerk position as of September 17 and was paid at the law clerk rate of 29 cents per hour for the entire month of September.

In his closing statement, Perotti again emphasized that his complaint was not focused on the small amount of money involved in his delayed promotion, but rather about the principle that he should not be penalized for exercising his right to file grievances. "All I want is you to send a message to them to let them know that they shouldn't just treat persons like this. Even though we are prisoners, we have Constitutional rights." R. 14 at 203.

The defendants' counsel argued that only Perotti's testimony supported his contention that he had been retaliated against. After canvassing the evidence presented at the trial, she argued that it was not reasonable to credit Perotti's version of events.

After deliberations of less than an hour, the jury, as we have noted, returned a verdict in favor of the defendants, finding that neither Quinones nor Kelsheimer had retaliated against Perotti.

Perotti filed a motion for a new trial in which he argued, among other points, that the court had deprived him of a fundamentally fair trial when it required him to appear by video conferencing rather than in person. The district court denied the motion, citing its original rationale for denying his

request for a writ of habeas corpus ad testificandum. *Perotti v. Quinones*, 2014 WL 87538, at \*2 (S.D. Ind. Jan. 9, 2014).

## II.

Perotti makes three principal arguments on appeal. He contends first that the district court did not objectively and properly balance the relevant *Stone* factors in denying his request for a writ of habeas corpus ad testificandum and deciding to have him appear remotely rather than in person at the trial. Among other things, he contends that the court did not sufficiently recognize the limits of participating in the trial by video and gave too much weight to the government's allegations as to the security risks his live participation in the trial would present. Second, Perotti argues that once the court decided that he should participate in the trial by video, it should have compelled the defendants to do the same in order to level the playing field. We review the court's decision-making in these respects for abuse of discretion. *See Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir. 2005); *Jones v. Hamelman*, 869 F.2d 1023, 1030 (7th Cir. 1989). Finally, Perotti claims that he was deprived of a fair trial by virtue of the court's decision to have him appear remotely rather than in person, and that consequently the district court erred in denying his request for a new trial. We review that ruling as well for an abuse of discretion. *E.g.*, *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014).

Section 2241(c)(5), as we recognized in *Stone v. Morris*, *supra,* authorizes a district court to order that an inmate be produced from anywhere in the United States so that he can give testimony in a case pending before that court. 546 F.2d at

737; *see also Barnes v. Black,* 544 F.3d 807, 809 (7th Cir. 2008). But the statute does not require a court to grant an inmate's request to appear in person and give testimony in support of his own case. *Stone,* 546 F.2d at 737. A prisoner enjoys a constitutional right of access to the courts, but that right is satisfied so long as he has the opportunity to consult with counsel and to present his case to the court. *Id.,* at 735. The opportunity to appear before the court in support of his claim is a matter addressed to the court's discretion. *Id.* In exercising that discretion, the court must weigh the inmate's interest in being present in court to give testimony in support of his claim against the government's interest in maintaining his confinement. *Id.; see also Verser v. Barfield,* 741 F.3d 734, 739 (7th Cir. 2013); *Lemons v. Skidmore,* 985 F.2d 354, 358 n.3 (7th Cir. 1993).

Our opinion in *Stone* identifies the following factors that the court should consider in weighing these competing interests: (1) the cost and inconvenience of transporting the plaintiff to court from his place of incarceration; (2) the potential danger or security risk that the plaintiff would pose to the court; (3) the substantiality of the matter at issue; (4) any need for an early determination of the claim; (5) the possibility of postponing trial until the plaintiff is released from prison; (6) the plaintiff's probability of success on the merits of his claim; (7) the integrity of the correctional system; and (8) the plaintiff's interests in presenting his testimony in person rather than by alternate means, such as by deposition. *Stone* added that the last of these factors—the plaintiff's interest in testifying in person rather than by other means—subsumes other considerations, including (a) whether the case will be tried to the bench or to a jury; (b) whether the plaintiff has other witnesses to call

or is the sole person who can provide testimony consistent
with his complaint; and (c) whether the defendants themselves
plan to testify. *See Moeck v. Zajackowski*, 541 F.2d 177, 181
(7th Cir. 1976) (identifying similar factors); *see also Poole v.
Lambert*, 819 F.2d 1025, 1028 (11th Cir. 1987); *Jerry v. Francisco*,
632 F.2d 252, 255 (3d Cir. 1980); *Ballard v. Spradley*, 557 F.2d 476,
480-81 (5th Cir. 1977). We have adhered to *Stone*'s balancing
test in subsequent cases. *See Verser*, 741 F.3d at 739; *Thornton*,
428 F.3d at 698-99; *Jones*, 869 F.2d at 1030.

What has most notably changed in the intervening decades
since we decided *Stone* is the availability of remote appearance
by video conferencing, which informs the eighth *Stone*
factor—the plaintiff's interest in appearing at the trial in person
rather than by other means. *Stone* itself assumed that, as a
practical matter, the likely alternative to having an inmate
transported to court to testify in support of his complaint was
having his deposition testimony read aloud in court. *See*
546 F.2d at 734, 736; *see also, e.g., Muhammad v. Warden, Balti-
more City Jail*, 849 F.2d 107, 113 (4th Cir. 1988) (noting that
alternatives included presenting case by affidavit, deposition,
tape recording, videotape, or administrative record) (citing *Kirk
v. United States*, 589 F. Supp. 808, 810 (E.D. Va. 1984)). And that
was largely true in those days. *Stone* was decided in 1976, and
although two-way video telecommunications were possible in
the 1970s (AT&T debuted its commercial "Picturephone"
service in Pittsburgh in 1970[5]), it was not until the 1990s, with

---

[5]  *See* Cade Metz, *Tech Time Warp of the Week: AT&T Uncloaks the Picture-
phone, 1970*, WIRED (Apr. 12, 2013), available at

(continued...)

the advent of high-capacity broadband telecommunications and advances in computer processing and video compression techniques, that such communications became available on a wider scale.[6] Until that time, the only other realistic options would have been to make a video recording of the plaintiff's deposition and play that back in court when the time came (which would permit the factfinder to see his face and hear his voice, but would not enable the plaintiff to actively participate in the trial), or to have the plaintiff appear and testify remotely via speakerphone (which would present a voice but not a face to the factfinder, and would enable the plaintiff to participate in the trial in only a limited sense). Video conferencing, by contrast, enables both the plaintiff in prison and those present in the courtroom to simultaneously see and hear one another in real time, and in that sense represents a great leap forward from the alternatives to in-court appearance that were available forty years ago. *See United States v. Baker*, 45 F.3d 837, 843-44 (4th Cir. 1995) (noting that video conferencing enables incarcerated litigant to be present, at least in some sense, at court proceeding and to confront and cross-examine witnesses against him); *Montes v. Rafalowski*, 2012 WL 2395273, at *2 (N.D. Cal. June 25, 2012) ("Despite [its acknowledged] shortcomings, … videoconferencing nonetheless facilitates plaintiff's meaningful participation at trial: plaintiff is able to testify, present

---

[5] (...continued)
http://www.wired.com/2013/04/tech-time-warp-picturephone/ (visited May 26, 2015).

[6] *See Videoconferencing*, WIKIPEDIA, http://en.wikipedia.org/wiki/videoconferencing (visited May 26, 2015).

evidence, and look each juror in the eye."); *Thomas v. O'Brien*, 2011 WL 5452012, at *6 (N.D.N.Y. Nov. 8, 2011) ("The use of video conferencing technology to permit a prisoner plaintiff's participation in a trial is not only a potential alternative [to his physical presence] …, but appears to present an option which has been and continues to gain growing acceptance.") (collecting case), *j. aff'd*, 539 F. App'x 21 (2d Cir. 2013) (non-precedential decision); *Twitty v. Ashcroft*, 712 F. Supp. 2d 30, 33 (D. Conn. 2009) (describing video conferencing as a "reasonable alternative" to prisoner's physical presence in court), *j. aff'd*, 455 F. App'x 97 (2d Cir. 2012) (non-precedential decision); *Fed. Trade Com'n v. Swedish Match N.A., Inc.*, 197 F.R.D. 1, 2 (D.D.C. 2000) (noting that testifying by video conferencing is essentially equivalent to testifying in person and is preferable to reading a witness's deposition); *Edwards v. Logan*, 38 F. Supp. 2d 463, 467-68 (W.D. Va. 1999) (conceding that video conferencing is not totally equivalent to a prisoner's in-person presence at trial, but noting that it is preferable to "stark" alternative of not allowing prisoner to participate at all).

Provisions of both Federal Rule of Civil Procedure 43 and the Prison Litigation Reform Act of 1996 ("PLRA") implicitly acknowledge that technological advances have made remote appearance and testimony a much more realistic possibility than it was in times past. Rule 43(a) continues to embody the presumption that witness testimony shall be taken in open court with the witness being physically present in court; but a provision adopted in 1996 adds that "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." By contrast, the

PLRA incorporates a presumption that, in pretrial proceedings conducted in prisoner suits regarding conditions of confinement, the prisoner *will* appear remotely rather than in person:

> To the extent practicable, in any action brought with respect to prison conditions in Federal court pursuant to section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility, pretrial proceedings in which the prisoner's participation is required or permitted shall be conducted by telephone, video conference, or other telecommunications technology without removing the prisoner from the facility in which the prisoner is confined.

42 U.S.C. § 1997e(f)(1).

This is not to say that appearance by video has come to be seen as the equivalent of in-person appearance, or that it necessarily should be. On the contrary, the advisory committee note accompanying the 1996 amendment to Rule 43 states:

> The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition. Transmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial.

Rule 43, advisory committee note (1996 amendment). And, notably, section 1997e(f)(1), which unlike Rule 43 is addressed

specifically to prisoner litigation, establishes a preference for the remote participation of the prisoner only in the pre-trial context. The provision is entirely silent as to trial proceedings, and we therefore agree with Perotti that it does not alter or displace the *Stone* balancing analysis as to an inmate's appearance at trial.[7] *But see Edwards*, 38 F. Supp. 2d at 466 (asserting that it is reasonable to conclude from section 1997e(f)(1) that Congress, if anything, sought to encourage the use of video conferencing and did not mean to limit the range of circumstances in which it may be employed). And our decision in *Thornton*, which sustained the court's decision in a prisoner suit to have all of the witnesses, including the plaintiff inmate, appear remotely, likewise recognized the limits of appearance by video rather than in person:

> Videoconference proceedings have their shortcomings. "[V]irtual reality is rarely a substitute for actual presence and . . . even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it." *United States v. Lawrence*, 248 F.3d 300, 304

---

[7] Nor does Rule 43 alter the *Stone* analysis. That rule does not specifically address prisoner-initiated litigation nor other situations in which the testimony of a prisoner is required. Securing the physical presence of an incarcerated individual requires the issuance of a writ of habeas corpus, which distinguishes the appearance and testimony of a prisoner from that of most other witnesses. *See Allen v. Wine*, 297 F. App'x 524, 533 (7th Cir. 2008) (non-precedential decision) (acknowledging Rule 43(a)'s good-cause requirement and noting that where incarcerated prisoners are concerned, "[t]he use of [video conferencing] technology is permissible as a matter of discretion").

> (4th Cir. 2001). "The immediacy of a living person is lost" with video technology. *Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir. 1993). As the court in *Edwards v. Logan*, 38 F. Supp. 2d 463 (W.D. Va. 1999), observed, "Video conferencing … is not the same as actual presence, and it is to be expected that the ability to observe demeanor, central to the fact-finding process, may be lessened in a particular case by video conferencing. This may be particularly detrimental where it is a party to the case who is participating by video conferencing, since personal impression may be a crucial factor in persuasion." 38 F. Supp. 2d at 467.

428 F.3d at 697.

Despite its limitations, decisions to have a witness (including an inmate) participate in a court proceeding by video conferencing have been rejected in a variety of contexts, as we recognized in *Thornton*, 428 F.3d at 697-98 (collecting cases); and *Thornton* itself, which was the first published appellate opinion addressing the use of video conferencing in the trial of an inmate's civil rights claim, sustained the use of video conferencing over the inmate's objection, *id.* at 698-99. *Thornton* did so within the *Stone* framework, emphasizing that the decision whether to have the inmate appear in person or by video is a discretionary one, *id.* at 697, and citing a number of the same factors that *Stone* identified as relevant to the court's exercise of discretion, *id.* at 698-99. *See also Allen v. Wine*, 297 F. App'x 524, 533 (7th Cir. 2008) (non-precedential decision) (decision to have plaintiff's inmate witnesses testify by video

conferencing); *Jones*, 869 F.2d at 1030 (decision to have plaintiff inmate appear at trial by video conferencing); *Am. Inmate Paralegal Ass'n v. Cline*, 859 F.2d 59, 62 (8th Cir. 1988) (per curiam) (decision to have inmate participate in pretrial conference by video conferencing).

Although video conferencing presents the court with an additional, and reasonable, option to a prisoner's physical presence in court to consider within the *Stone* framework, we see no need at this time to alter the *Stone* framework itself. Certainly video conferencing, by permitting an inmate to appear at trial, give testimony, confront the other witnesses, and interact with the other trial participants (and vice versa), presents the court with a much less dire choice between having the inmate physically present in court or not having him present at all and presenting his testimony in only a recorded form. But depending on the equipment and arrangements available to the court, there will often be limits on what the inmate can see: Perotti, for example, could not see the facial expressions of the jurors, nor, given the placement of the courtroom monitor and camera, could he see the judge or the defense table when a witness was testifying. As we discuss below, we are not convinced that these limitations deprived Perotti of a fair trial. But they do serve to illustrate how appearing remotely by video conferencing is not a perfect substitute for a prisoner's physical presence in the courtroom. And because video conferencing facilities and capabilities will vary from court to court and prison to prison, the extent of such limitations will vary from case to case. A court may therefore not simply assume that remote appearance by video conferencing will necessarily be good enough in any case. The

court still must balance the prisoner's interest in being present physically in the courtroom and the government's interest in having him remain in his place of incarceration. In balancing those competing interests, the court should still have in mind how important credibility is to the case, and how remote appearance may (a) limit the factfinder's ability to evaluate the inmate's credibility as a witness, (b) make it more difficult for the inmate as a party to confront and evaluate the other witnesses and exhibits, (c) impose a logistical burden on the inmate's ability to interact with his counsel, the court, and opposing counsel, and to react on the fly to unexpected developments. Requiring a prisoner to appear remotely is not a decision to be made lightly, as we said in *Thornton*. 428 F.3d at 698, and the court must make the decision with a realistic appreciation of how much the available technology will enable all parties to see and hear of one another, and how the limitations of video conferencing are likely to impact the presentation of the inmate's case, the factfinder's assessment of the evidence, and the fundamental fairness of the trial. *See generally Sisk v. United States*, 756 F.2d 497, 500 (7th Cir. 1985) ("When a prisoner's pro se civil action reaches the trial stage, and his claim proves sufficiently meritorious to survive motions for dismissal and summary judgment, a court must then take all steps necessary to insure that the inmate receives the fair day in court to which he is entitled.") (internal quotation marks and citation omitted).

In this case, Judge Magnus-Stinson carefully considered these and the other pertinent *Stone* factors, and we cannot quarrel with her decision that the government's interest in keeping Perotti incarcerated at the federal penitentiary in

Fairton, New Jersey outweighed his interest in participating in
the trial in person. The government made a showing that
transporting Perotti to Indianapolis for the trial posed both an
expense to the government as well as a security risk, given his
reported history of assaultive behavior. The trial itself pre-
sented a single, straightforward issue—whether Perotti had
initially been denied the promotion to law clerk for retaliatory
reasons—and because the alleged retaliation had, at most,
delayed rather than blocked his promotion, the injury and
damages claimed were modest: less than $30 by Perotti's own
estimate, and perhaps less than $5 by the defendants' account-
ing. Certainly we agree with Perotti that his theory of the case
posited a violation of his First Amendment rights, even if he
was deprived of only a small amount of wages. Yet, he was, in
the end, not deprived of the law clerk position; at worst, his
promotion was delayed for a matter of weeks. So his injury, if
any, was temporary and minor, in the scheme of things. The
trial was expected to and did require no more than a day, there
being only a handful of witnesses with knowledge of relevant
facts. And because Perotti was no longer represented by
counsel, there was no logistical difficulty posed as to whether
counsel should be present with him in the prison or in the
courtroom with the other parties to the trial and, if the latter,
how to facilitate private consultations between counsel and
Perotti. Under these circumstances, the judge was justified in
concluding that Perotti's remote appearance by video was an
acceptable alternative to his appearance in person which,
despite its shortcomings, permitted his full participation in the
trial.

We wish to highlight that before the judge made this decision, she conducted a pretrial conference with Perotti appearing by video. Thus, rather than making assumptions or relying on second-hand information about video conferencing, the judge was able to both confirm that Perotti's remote participation was logistically possible and to assess first-hand its efficacy as an alternative to Perotti's in-person participation. *See also*, *e.g.*, *Miranda v. Utah*, 2009 WL 464526, at *1 (D. Utah Feb. 24, 2009). The judge observed that everyone at the conference could see and hear Perotti, and that he, in turn, could see both the courtroom and the participants. It was, consequently, reasonable to conclude that, at trial, the jury would be able to assess his credibility as a witness, and that he likewise would be able to observe and respond to the other trial participants.

Consistent with our decision in *Thornton*, the judge had in mind that Perotti's participation by video was, by no means, a complete substitute for his appearance, including his testimony, in person. 2013 WL 4008188, at *4. The court acknowledged specifically that the case was likely to present questions of credibility for the jury to resolve, that Perotti might be the sole witness who could provide testimony in support of the allegations of his complaint, that he had an interest in presenting such testimony in person, and that "[t]he shortcomings of video testimony are real." *Id.* Nonetheless, in light of the factors supporting the government's opposition to producing Perotti's person for trial, the court judged his remote appearance by video conferencing sufficient to permit Perotti's wish to testify and to participate in the trial and to permit the jury to assess his demeanor and credibility. *Id.* Quantifying the degree

to which a plaintiff's appearance by video link rather than in
person might put him at a disadvantage at trial is impossible;
deciding whether to authorize the plaintiff's appearance will
always involve a delicate balance of intangible factors that the
district judge is best suited to make. Our role as an appellate
court is to ensure that the judge considered the appropriate
criteria and struck a reasonable balance of the competing
interests. When she has applied the proper framework and has
not omitted anything significant from her analysis, it will be
the rare case where we might find an abuse of discretion.

Perotti contends that the government exaggerated the risk
of transporting him to the trial and that the district court was
wrong to accept at face value its allegations as to the danger he
posed. The government's opposition to Perotti's petition for a
writ of habeas corpus ad testificandum was supported by an
affidavit from the associate warden of the federal correctional
complex at Terre Haute, where Perotti would be housed for
trial assuming his request were granted. The associate warden
had access to Perotti's central file, which included records
generated in connection with two instances in 2012 in which
Perotti had been transported out of his correctional facility for
medical care. Those records, which were attached to the
warden's affidavit, indicated that although Perotti was not
deemed to present an escape risk, he did have a history of
violence and assaultive behavior, including a prior assault on
correctional staff, which warranted heightened caution on the
part of those transporting him and the application of full
restraints to Perotti himself. R. 148-3. In his pro se reply
memorandum (by this time Perotti's counsel had been released
from the case), Perotti denied that he had ever assaulted a

correctional officer, and averred that he had only been in-
volved in one altercation in which another prisoner was the
aggressor and Perotti had only defended himself. R. 171 at 5-6.
Perotti also points out that he was assigned to a medium-
security unit at Fairton and he was transferred to another
medium-security facility shortly after trial, facts which he
contends are inconsistent with the notion that his transport
presented any real danger. We are not privy, however, to the
criteria for assignment to a medium-unit facility, nor does the
record reveal whether the same criteria are used in assessing
the risks an inmate poses for purposes of housing versus
transporting a prisoner. Despite Perotti's denials that he posed
any danger, the judge was entitled to give weight to the BOP's
contemporaneous records, generated well before Perotti
sought the writ, indicating that he posed a heightened risk to
the officers transporting him, a risk which increased the cost as
well as the potential adverse consequences of transporting him
from New Jersey to Indiana. If nothing else, Perotti's status as
an armed career criminal tended to convey some credence to
those records. We cannot say that the district judge abused her
discretion by citing this factor as an important "concern" in her
analysis. 2013 WL 4008188, at *4. *See Barnes v. Black*, *supra*,
544 F.3d at 810 ("'Writting' prisoners to a distant court entails
cost and even danger … .").

Perotti alternatively argues that once the court concluded
that he should appear by video rather than in person, it should
have ordered the defendants (and their counsel) to appear by
video as well, in order to eliminate any advantage they would
have by being in the jury's presence. *Cf. Montes v. Rafalowski*,
*supra*, 2012 WL 2395273, at * 3 (directing parties, in view of

court's decision to have plaintiff inmate participate in trial by video conferencing, to consider whether other witnesses, including percipient witnesses in particular, should also appear by video conferencing, so as to eliminate any unfair advantage in favor of defendants). This was not an argument that Perotti made below, and thus it was not one to which the defendants had an opportunity to respond or that the district judge had an opportunity to consider. We therefore consider the argument waived. *See*, *e.g.*, *Ammons-Lewis v. Metro. Water Reclamation Dist. of Gr. Chicago*, 488 F.3d 739, 744 (7th Cir. 2007).

Even if Perotti had preserved the argument, it is not clear to us that it would have been an abuse of discretion for the district court to reject the proposal he now puts forward. First, this was not a case, like *Thornton*, in which there were many witnesses who were "scattered all over the state" at different correctional facilities, 428 F.3d at 698, nor was it a case in which all or most of the parties and witnesses were either imprisoned or employed at one correctional facility, such that it would be both simpler and more economical to have them all (including their attorneys, even) participate in the trial remotely. Second, Quinones and Kelsheimer, whom Perotti sued in their individual capacities, had their own interests as defendants in appearing in person (although this required them to travel from Terre Haute to Indianapolis). Certainly the court, if it were inclined to explore this possibility, could have asked the defendants whether they would agree to appear remotely. But it is not clear that they would have waived their right to appear in person, nor is it obvious that the district court could have compelled them to appear by video over their own objections, when they were not incarcerated as Perotti is and required no

writ to secure their own presence. *Cf. Price v. Johnston*, 334 U.S. 266, 285-86, 68 S. Ct. 1049, 1060 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. Among those so limited is the otherwise unqualified right … to parties in all the courts of the United States to plead and manage their own causes personally.") (internal quotation marks and citation omitted), *overruled on other grounds by McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454 (1991); *Hernandez v. Whiting*, 881 F.2d 768, 770 (9th Cir. 1989) ("imprisonment suspends the plaintiff's usual right to be personally present at judicial proceedings brought by himself or on his behalf"). Any concern about the possibility of stigma stemming from the fact that the inmate is the sole participant to appear remotely may be dealt with in other ways, as by giving the jury a cautionary instruction. *Cf. Allen v. Wine*, *supra*, 297 F. App'x at 533 (noting that jury was instructed to give equal consideration to video and in-person testimony). As we have noted, Perotti has not argued that the district court should have said anything more on the subject of his remote participation in the trial.

We again note that the district court was meticulous in doing everything it could to ensure that Perotti could see as much of the proceeding and of the participants as possible. It routinely checked to make sure he could see the venire members during voir dire and the witnesses when they testified. It had each courtroom witness sit in the well of the courtroom to improve Perotti's view of the witness, and defense counsel stood behind the witness when questioning her so that Perotti could at once see both the witness and

counsel on his monitor. There is, as the district court noted, no question that everyone in the courtroom could see Perotti and assess his demeanor as a witness, given the large monitor. The only significant issue he has raised, which he voiced on several occasions during the trial, is that he was not able to see the facial expressions of the jurors. No doubt this was due in part, as Perotti has argued, to the size of his own monitor, which was much smaller than the one in court. In part it may also have been due to the fact that there was only one camera in the courtroom, with the result that he had a single view of the proceeding rather than separate views (on a split screen) of the witness, jury, judge, and so forth. *Cf. Thornton*, 428 F.3d at 698-99 (noting that jury viewed a four-way screen with views of judge, plaintiff, witnesses, and defense counsel). And although Perotti has complained about his inability to see the entire courtroom, including the defense table and the judge herself (who was out of the range of the camera when it was moved closer to the witness chair and the jury box), we view this limitation as a more minor matter than his ability to see the witnesses and the jury.

There may be ways in future cases to address the type of concerns that Perotti has raised. A larger video monitor for the inmate, and/or one presenting him with multiple views of the courtroom participants (presumably from multiple cameras), might make it easier for the inmate to observe the demeanor of each participant, including the jurors. Whether such accommodations are feasible will no doubt depend on the respective resources of the court as well as the prison in which the inmate is housed. And even a relatively sophisticated arrangement may not permit the inmate to see everything and everyone as

well as he might like (although the same might well be true if the inmate were present in court, a point we shall develop in a moment). All we can ask is that the trial court do what it thinks best given the options at hand. To the extent it is possible, the court may wish to evaluate the view of the proceedings that is being transmitted to the prisoner (on a comparably-sized monitor), so that it can evaluate for itself the adequacy of the prisoner's view and make a record of its impressions.

We are not convinced that the limitations on what Perotti could see of the trial and its other participants prejudiced him meaningfully, such that the district court abused its discretion in denying his motion for a new trial. At worst, Perotti could not make out the demeanor of the jurors, and thus was deprived of one (potential) data point on how his testimony and that of the other witnesses was being received by the factfinder. But Perotti would not necessarily have been be able to see the faces of all jurors at all times had he been physically present in court: the facial expression of a juror who is turned toward a witness, for example, may not be visible to someone who is sitting at a table with counsel. And for someone like Perotti, who was conducting his own case, it would not always have been possible for him to be looking at the jury when he was not on the witness stand himself. He also had to be paying attention to the witness, what defense counsel or the judge might have been saying, what was in an exhibit under discussion, and so forth. We do not mean to dismiss Perotti's concern. Any court dealing with a remote appearance by a party should be vigilant, as this judge was, to ensure that the party can see as much of the proceeding and its participants as is logistically

possible. But we point out that there is no suggestion that anything of concern transpired with the jury that Perotti was unable to observe or deal with. His argument is simply that he lacked that intangible input that a better view of the jurors might have provided him.

This was a straightforward case presenting essentially one issue to the jury and the likelihood of a modest award of damages to Perotti in the event he prevailed. Perotti's injury, if any, was a minor one, as we have mentioned. Credibility was central to the resolution of the case, but there is no question that the jury could see and hear Perotti for purposes of evaluating his credibility. Having Perotti participate by video was not the equivalent of him appearing before the jury in person, but there is no reason to think, as the district judge herself pointed out, that his presence would have changed things. The other witnesses gave testimony that was wholly inconsistent with Perotti's theory of the case but consistent with one another's testimony in material respects. Whatever intangible benefit Perotti might have gained by being physically present in the courtroom—and we do not discount that there would have been one—does not by itself overcome the presumption that the jury's verdict against him was valid.

Given the relatively simple nature of the case, the cost and logistical burden of transporting Perotti to court, and the adequacy of the available video conferencing technology, the district court made a reasonable decision to have Perotti appear by video rather than in person. Although Perotti understandably would have preferred to appear in person, the record does not support the notion that he was unduly prejudiced.

## III.

The district judge did not abuse her discretion in denying Perotti's petition for a writ of habeas corpus ad testificandum and having him instead testify and participate in the trial by video conferencing. The judge did everything she could do to ensure that Perotti could see as much of the trial proceeding and its participants as was possible, and we commend her for the job she did. We also wish to thank Perotti's appointed counsel for their vigorous and effective advocacy on his behalf.

AFFIRMED