#28479-a-SLZ
**2018 S.D. 81**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

In the Matter of
the Guardianship and
Conservatorship of
I.L.J.E., a Minor Child.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BROOKINGS COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE GREGORY J. STOLTENBURG
Judge

\* \* \* \*

KASEY L. OLIVIER
ASHLEY M. MILES HOLTZ of
Heidepriem, Purtell, Siegel
   & Olivier, LLP                Attorneys for Appellant,
Sioux Falls, South Dakota       Irving D. Jumping Eagle.


TIMOTHY T. HOGAN of
Ribstein & Hogan Law Firm      Attorneys for Appellees,
Brookings, South Dakota        Lloyd and Katie Warren.

\* \* \* \*

ARGUED ON
AUGUST 28, 2018
OPINION FILED **12/12/18**

#28479

ZINTER, Justice[1]

[¶1.]    A child's mother was killed by the child's father while the child was in the custody and care of the mother's brother and sister-in-law.  The brother and sister-in-law subsequently petitioned for guardianship of the child.  Although the father was then in jail for the homicide, he opposed the petition and requested that his sister, a Native American, be appointed the child's guardian.  The child is an enrolled member of an Indian tribe, and the parties agreed that the Indian Child Welfare Act (ICWA) applied.  After an evidentiary hearing, the circuit court overruled the father's objection and granted the sister-in-law and brother's petition for guardianship.  Father appeals.  We affirm.

**Facts and Procedural History**

[¶2.]    Alicia and Irving Jumping Eagle were married and had one child together, I.L.J.E. (hereinafter the "child" or I.L.J.E.).  Alicia also had another child, C.W., from a prior relationship.  On March 31, 2017—when I.L.J.E. was two years old, and C.W. was nine years old—Alicia's sister-in-law, Katie Warren, asked Alicia if C.W. could spend the weekend at Warrens' home.  The invitation was extended so C.W. could spend time with his cousins.  Alicia accepted the offer and also asked Katie if she would care for I.L.J.E.  Katie agreed, and both children spent the weekend at Katie and her husband Lloyd Warren's home.

[¶3.]    On Sunday evening, Warrens could not locate Alicia.  On Monday evening, they learned that Alicia had died as a result of a homicide.  Irving was the

_____

1.    This opinion was authored by Justice Zinter prior to his death.

-1-

suspected perpetrator and was being held in jail. Warrens continued to provide custodial care for I.L.J.E.; C.W.'s father cared for C.W.

[¶4.]        Three days after learning of Alicia's death, Warrens petitioned for a temporary guardianship of I.L.J.E. under the South Dakota Guardianship Act. They alleged an immediate need because neither parent was able to care for the child and because it would be in the child's best interest. *See* SDCL 29A-5-210. In an affidavit attached to the petition, Warrens explained that they were the child's maternal aunt and uncle, and no other close relative was available to care for the child.[2] The circuit court granted the temporary petition without notice. Irving was subsequently served with notice of the temporary guardianship, and he did not file an objection.

[¶5.]        In June 2017, Warrens petitioned for a permanent guardianship under the Guardianship Act. They alleged I.L.J.E. could not care "for his health, care, safety, habilitation, or therapeutic needs[.]" *See* SDCL 29A-5-302. Irving retained

---

2.      The affidavit stated:

> We believe that [the child's father's] parents are both deceased. The parents of Petitioner, Lloyd V. Warren and the deceased Alicia, are also deceased. The Petitioner, Lloyd V. Warren has a sister, Katie Lovstad, who resides in Baltic, South Dakota. We believed that [the child's father] has a sister who lives in Nebraska, although we are not aware of her name or how to contact her. We also believe that he has a sister that lives in North Dakota, although we have been informed that she is currently in Europe. We have not spoken with or met either of his sisters in the past. We know of no other close relatives of either side of the family that can take immediate care of the minor child, [I.L.J.E.]. The other minor child of the decease[d], [C.W.], is with his biological father[.]

counsel, opposed the petition, and moved for an order appointing his sister Dr. Sara Jumping Eagle as I.L.J.E.'s temporary guardian and conservator.

[¶6.]     The circuit court conducted a status hearing in July. Irving remained incarcerated for the homicide and did not attend the hearing, but his lawyer did not object to Irving's absence. During the hearing, the court determined an immediate need continued to exist for the temporary guardianship. Counsel for Irving requested that the court place the child with Dr. Jumping Eagle so she could "facilitate regular communication" between Irving and the child while Irving was incarcerated. The court declined, noting that it did not intend "to play ping pong with the child." Instead, and because "there ha[d] been no allegations" that the current temporary guardianship was "not working," the court continued the temporary guardianship with Warrens for 90 days and scheduled the hearing on the permanent guardianship for October 6.

[¶7.]     Warrens were not aware I.L.J.E. is an enrolled member of the Oglala Sioux Tribe, and the question whether ICWA applied in this guardianship proceeding first arose during the July status hearing. *See* 25 U.S.C.A. § 1903(1) (defining child custody proceedings for purposes of ICWA). Irving's counsel asserted that ICWA did *not* apply because this was "not an abuse and neglect case." Nevertheless, after learning of the tribal membership at the hearing, Warrens provided the Tribe with notice of the petition for permanent guardianship and of the October 6 hearing as required by 25 U.S.C.A. § 1912(a). The Tribe subsequently intervened and participated in the remaining proceedings. The Tribe did not, however, object to a guardianship or request to transfer the proceeding to tribal

court under ICWA.  The Tribe has also not appeared or participated in favor of Irving in this appeal.

[¶8.]          By the time of the October 6 hearing, Irving had pleaded guilty to voluntary manslaughter, and he remained incarcerated pending sentencing.  Before the hearing on the permanent guardianship, Irving's lawyer requested Irving be allowed to be physically present in the courtroom.  The court denied the request, and Irving participated via interactive video conferencing (ITV).  During the hearing, the parties called and cross-examined Katie, Lloyd, Dr. Jumping Eagle, and ICWA expert Luke Yellow Robe concerning care of the child.  Neither Dr. Jumping Eagle nor any other member of Irving's extended family petitioned for guardianship.  However, Irving entered into evidence a document he had signed on April 20, 2017, in which he purported to "give custody" of I.L.J.E. to Dr. Jumping Eagle.

[¶9.]          At the conclusion of the hearing, the circuit court found that both parents were unavailable to care for the child; Alicia was dead and Irving was unavailable because his criminal act of killing Alicia caused him to be incapable of having custody of I.L.J.E.  The court further found Irving's criminal act caused the breakup of the family.  The court concluded that Irving's "criminal act in killing the minor child's mother [was] substantial evidence" that he "ha[d] not only abandoned the child, forfeited, or surrendered his parental rights, but he ha[d] also created circumstances that result[ed] in serious detriment to the child[.]"

[¶10.]          The court further concluded that Irving's April 20 document attempting to "give custody" to Dr. Jumping Eagle did not preempt the court's

ability to determine a guardianship. Citing SDCL 25-4-45.6, the court observed that Irving's conviction for the homicide of the child's mother would create a rebuttable presumption that awarding custody or visitation to Irving would not be in the child's best interest.[3] The court further observed that Irving did not rebut that presumption. Thus, the court held ineffective Irving's purported attempt to preempt the court's decision on guardianship and control custody of the child through his designation. The court further ruled that even if it considered Irving's designation as a preference under ICWA, the "criminal act of killing the mother lean[ed] heavily against any preference under the federal statute and would circumvent the Congressional declaration of policy" of ICWA. The court noted that "ICWA should not be used as a sword to allow the father, from his prison cell, to direct the placement and care of [I.L.J.E.] in contravention of the intent of the Act itself."

[¶11.] With respect to Warrens' suitability as guardians, the court found that they had been in a long-term marriage, had a stable home, were involved in their community, and had other children living in their home. The court also found they were financially, emotionally, and morally fit to be guardians; and they would provide the child a stable and loving home. Although Warrens were non-Indians, the court noted that they were part of the child's "extended family" within the

---

3. SDCL 25-4-45.6 provides in part:

> A conviction for the death of the other parent creates a rebuttable presumption that awarding custody or granting visitation to the convicted parent is not in the best interests of the minor.

meaning of ICWA's required placement preferences because Warrens were his maternal aunt and uncle. *See* 25 U.S.C.A. § 1915(b).[4] The court also specifically acknowledged that Warrens had not taken "direct action to understand the Lakota culture or heritage," but the court found they desired to raise I.L.J.E. with knowledge of his Lakota heritage. The court further found that Warrens would promote visitation with Irving's native family, including Dr. Jumping Eagle, and that they would work with her to develop the child's "cultural awareness and his heritage with the Lakota Nation." The court granted Warrens' petition for permanent guardianship.

[¶12.] Irving appeals and raises three issues, which we restate as follows:

1. Whether the Guardianship Act can be used to transfer custody from a parent to a nonparent.

2. Whether Irving's right to due process was violated by the transfer of custody to a nonparent without following the procedures required in abuse and neglect proceedings.

3. Whether, considering ICWA, it was in I.L.J.E.'s best interests to award the guardianship to Warrens instead of Dr. Jumping Eagle.

---

4. ICWA defines a "foster care placement" to include temporary placement in a home of a guardian. 25 U.S.C.A. § 1903(1)(i). In a foster care placement, 25 U.S.C.A. § 1915(b) provides in part that:

> a preference shall be given, in the absence of good cause to the contrary, to a placement with--
> **(i)** a member of the Indian child's extended family;
> **(ii)** a foster home licensed, approved, or specified by the Indian child's tribe;
> **(iii)** an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
> **(iv)** an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

**Decision**

*Transfer of Custody to a Nonparent under the South Dakota Guardianship Act*

[¶13.]        Irving first argues the circuit court lacked jurisdiction to transfer custody of I.L.J.E. to a nonparent under the Guardianship Act.  A circuit court's subject matter jurisdiction depends upon statutory or constitutional authorization. *In re Guardianship of Nelson*, 2013 S.D. 12, ¶ 17, 827 N.W.2d 72, 77.  Here, the Guardianship Act specifically provides that "[c]ustody of a child may be sought by a person other than the parent," *see* SDCL 29A-5-106, and Warrens sought custody of I.L.J.E. under that Act.  They requested the temporary guardianship alleging "immediate need" and "best interests" of the child (SDCL 29A-5-210).  They requested the permanent guardianship asserting concerns over the child's "health, care, safety, habilitation, or therapeutic needs" (SDCL 29A-5-302).  The circuit court had subject matter jurisdiction to consider this petition by nonparents.

[¶14.]        Irving next argues that even if the court had subject matter jurisdiction, Warrens were not entitled to seek custody of I.L.J.E.  Irving points out that in *In re Guardianship and Conservatorship for T.H.M.*, 2002 S.D. 13, ¶ 11, 640 N.W.2d 68, 72, a majority of this Court held that when abuse and neglect is the contested issue, the Department of Social Services is the only party that may involuntarily deprive a parent of custody and place the child in the custody of a nonparent.  According to Irving, abuse and neglect was the issue in this case, and consequently, Warrens could not seek custody utilizing the Guardianship Act.

[¶15.]        We disagree for two reasons.  First, *T.H.M.* has been overruled to the extent it prohibited a nonparent from obtaining custody under the Guardianship

Act. *See In re Guardianship of S.M.N.*, 2010 S.D. 31, ¶ 16, 781 N.W.2d 213, 221.

Second, even if *T.H.M.* still applied, this guardianship was not sought on the ground

that I.L.J.E. was abused or neglected; thus, abuse and neglect were not the central

issues in the case. Irving affirmatively asserted that fact at the status hearing. We

conclude that Warrens could seek the guardianship under the Guardianship Act.

[¶16.] Irving, however, alternatively contends that even if Warrens could

obtain a guardianship under the Guardianship Act, a guardianship was not

available here because Irving had previously given his sister "custody" of I.L.J.E. in

the document he signed on April 20, 2017. Although he acknowledges he was

convicted of killing the child's mother, he argues his right as a biological parent to

direct the care and custody of his child remained intact at the time of his April 20

custody designation because he was still maintaining his innocence. Irving

essentially contends that his designation of a custodian preempted the court's

ability to appoint a guardian.

[¶17.] We reject Irving's contention for a number of independent reasons.

First, his temporary assertion of innocence is not controlling. He pleaded guilty to

committing the homicide. Further, we agree with the circuit court that he failed to

rebut the statutory presumption under SDCL 25-4-45.6; therefore, his attempt to

control custody of the child through his designation was ineffective. Second, Irving

cites no law to support the proposition that his April 20 designation either voided

the circuit court's pre-existing April 7 order granting temporary guardianship to

Warrens or deprived the circuit court of authority to appoint a guardian. Third, we

agree with the circuit court's conclusion that, by his criminal act of killing the

child's mother, Irving "has essentially given up" his right as the biological parent to transfer custody to a third party. The court explained that Irving could not control custody after the homicide because he had forfeited or surrendered that right to a person other than a parent and because he had abandoned the child.

[¶18.] On appeal, Irving argues he did not abandon I.L.J.E. He contends he established he had no intent to abandon or relinquish his presumptive right to the custody of his child by giving custody to Dr. Jumping Eagle. We need not address Irving's abandonment argument because he does not contest the circuit court's forfeiture and surrender conclusions. A biological parent's presumptive right to custody can be rebutted by evidence of abandonment *or* by evidence of other extraordinary circumstances. *S.M.N.*, 2010 S.D. 31, ¶ 16, 781 N.W.2d at 221; SDCL 25-5-29. Other extraordinary circumstances include, among other things, evidence of parental forfeiture or surrender of parental rights to another person. SDCL 25-5-29(2). Thus, even if abandonment did not occur, we agree with the circuit court's alternative conclusion that by killing the child's mother, and by incurring a 100-year penitentiary sentence, Irving forfeited his parental right to control custody for the foreseeable future. Additionally, there is no dispute that after the killing, Irving claimed to have surrendered his parental rights to another person (his sister). We agree with the circuit court's determination that under these facts, Irving's April 20 designation did not preempt a guardianship.

*Irving's Right to Due Process*

[¶19.] Irving first argues the circuit court proceedings conducted under the Guardianship Act failed to protect his parental right to the care, custody, and

control of his child. He contends that to adequately protect those constitutional rights, Warrens were required to provide him the procedural protections found in SDCL chapters 26-7A and 26-8A, governing abuse and neglect proceedings. Irving points out that in *T.H.M.*, we stated that the abuse and neglect chapters employ constitutional safeguards not present in the Guardianship Act and that those "safeguards cannot be brushed aside by those seeking custody, by the attorneys, or by the trial court[.]" 2002 S.D. 13, ¶ 14, 640 N.W.2d at 73. However, the Legislature passed emergency legislation changing the guardianship statutes shortly after *T.H.M.* was published; and eight years later, we held that the then-amended Guardianship Act and SDCL chapter 25-5 adequately protect the constitutional rights of natural parents to the custody of their children. *S.M.N.,* 2010 S.D. 31, ¶ 20, 781 N.W.2d at 222. Therefore, due process concerns did not foreclose use of the Guardianship Act in this case.

[¶20.]     Irving alternatively argues he was entitled to the procedural protections of the abuse and neglect statutes because I.L.J.E.'s need for supervision brought the case under the abuse and neglect statutes. The only support he provides for this argument is his citation to the abuse and neglect statutes themselves. Those statutes do require a variety of additional, procedural protections when the State initiates a proceeding based on its allegation that a child has been abused or neglected. But this is not such a case. Moreover, we have declined to extend the procedural protections of the abuse and neglect statutes to other, non-abuse and neglect family law cases. *See, e.g., Pfuhl v. Pfuhl*, 2014 S.D. 25, ¶ 11, 846 N.W.2d 778, 781 (holding that an abuse and neglect statute governing

the payment of court-appointed attorney fees did not apply to a civil protection order proceeding).

[¶21.] We acknowledge that the underlying grounds for guardianships and abuse and neglect proceedings may overlap at times. But they did not do so in this case. Further, *S.M.N.* made clear that private petitioners for guardianship need not provide parents with the same procedural protections required when the State initiates an abuse and neglect proceeding based on its allegation that a child is being abused and neglected. 2010 S.D. 31, ¶ 20, 781 N.W.2d at 222. Additionally, Irving has not demonstrated prejudice from the purported denial of any particular procedural right. We conclude Warrens were not required to provide Irving with each one of the procedural protections required in State-instituted abuse and neglect proceedings.

[¶22.] Irving, however, also argues that the procedures actually employed were insufficient to satisfy due process. He points out that in *S.M.N.* we specifically noted that the legislative amendments following *T.H.M.* did not abrogate the basic constitutional protections due to a parent when a court transfers custody to a nonparent. *See S.M.N.*, 2010 S.D. 31, ¶ 19, 781 N.W.2d at 222. He claims due process violations here because he did not receive notice of the temporary guardianship prior to the court's order of appointment, he did not obtain a lawyer until June, and he was not present at a July hearing.

[¶23.] Irving has not shown a due process violation on any of these claims. Although Irving did not receive pre-appointment notice of the temporary guardianship, there is no right to pre-appointment notice in temporary

guardianships where there is an immediate need: notice need only be mailed after the order of appointment, and Irving received his copy. *See* SDCL 29A-5-210. Additionally, although Irving did not have a lawyer in the temporary guardianship proceedings, he obtained a lawyer after Warrens filed their petition for permanent guardianship, and Irving's lawyer appeared thereafter, actively opposing the guardianship at all material stages of the case. Finally, although Irving was not present at the July status hearing, he appeared through his lawyer, and his lawyer did not object to Irving's absence.

[¶24.] Irving, however, also claims his due process rights were violated when he was not permitted to appear personally for the October guardianship hearing and was instead required to appear via ITV.[5] Irving's counsel was personally present at the hearing, and she objected at the start of the proceedings, arguing that Irving could not effectively cross-examine adverse witnesses because he would be unable to consult with counsel while witnesses were testifying. In civil cases, "while the suppression of all cross-examination may amount to a denial of due process, restriction of cross-examination [will] rarely rise to constitutional dimensions, although it might amount to an abuse of discretion where the probative value of the excluded evidence [is] sufficiently high." *Castano v. Ishol*, 2012 S.D. 85, ¶ 10, 824 N.W.2d 116, 119.

---

5.   Irving made no claim before the circuit court and makes no claim on appeal that the circuit court's order denying his request to appear in person violated any of the rules in SDCL chapter 15-5A for us of an interactive audiovisual device in court proceedings.

[¶25.] In this case, Irving's contention is *at most* a restriction on cross-examination, not a complete denial of cross-examination. Additionally, Irving has failed to show that his appearance via ITV restricted his ability to introduce any probative evidence. He makes no showing either that he was denied a request to consult with counsel during the hearing or that there were topics he would have pursued on cross-examination had he been personally present.

[¶26.] Nevertheless, Irving insists he has an absolute due process right "to be personally present in the courtroom." We disagree. Many courts have held that prisoners prohibited from participating in child custody proceedings are not denied due process when the prisoner is given an opportunity to cross-examine witnesses through counsel and to testify by deposition or other alternative means. *See, e.g., In re C.G.,* 885 P.2d 355, 357 (Colo. Ct. App. 1994) (finding no due process violation in a proceeding involving the termination of parental rights); *Pignolet v. State Dep't of Pensions & Sec.,* 489 So. 2d 588, 590–91 (Ala. Civ. App. 1986); *In re J.S.,* 470 N.W.2d 48, 52 (Iowa Ct. App. 1991); *In re Randy Scott B.,* 511 A.2d 450, 452–54 (Me. 1986); *In re Raymond Dean L.,* 109 A.D.2d 87, 88-90 (N.Y. App. Div. 1985); *In re L.V.,* 482 N.W.2d 250, 257–59 (Neb. 1992); *In re Quevedo,* 419 S.E.2d 158, 160–62 (N.C. Ct. App. 1992); *In re F.H.,* 283 N.W.2d 202, 206-09 (N.D. 1979); *In re Rich,* 604 P.2d 1248, 1252–53 (Okla. 1979); *In re Darrow,* 649 P.2d 858, 859–61 (Wash. Ct. App. 1982). Other courts have also found no due process violation in civil cases where the circuit court ordered a prisoner to appear by video conferencing rather than personally, although courts have cautioned that the decision to conduct civil proceedings involving an inmate by video conference should be carefully considered.

*See Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir. 2005); *Vincent v. MacLean*, 89 A.3d 1208, 1212 (N.H. 2014).

[¶27.]    We see no due process violation in this case.  Irving made only a general due process objection to the denial of his request to appear in person by mentioning that his ability to cross-examine witnesses would be limited.  Further, his attorneys were personally present in the courtroom throughout the hearing, and he made no claim before the circuit court that he was unable to adequately hear, respond, or present his claims to the circuit court.  Also, at the time of the hearing, he had pleaded guilty to a violent offense and was housed approximately one hour from the courthouse.  Under these circumstances, Irving has failed to show either a due process violation or an abuse of discretion in denying his request to appear in person.  He has also failed to show prejudice in that any purported difficulties in appearing via ITV changed the outcome of the proceeding.

[¶28.]    During oral argument, Irving also argued ICWA provided him additional due process rights that were violated in the temporary guardianship proceedings.  Irving claimed that the "filing of the [temporary] petition was a 'removal' of the child" within the meaning of "ICWA statutes" guaranteeing him a due process right to a "48-hour hearing," at which Irving would have been advised of his rights and appointed counsel.  Irving does not, however, identify the ICWA provision that mandates these procedural protections in a temporary guardianship proceeding.  Because of his reference to the "48-hour hearing," we perceive his claim to be based on the ICWA obligations imposed upon the State when it removes

Indian children from their parents and places them into temporary custody in abuse and neglect cases prosecuted under SDCL chapters 26-7A and 26-8A.

[¶29.] The "48-hour hearing" and its associated rights are creatures of State law. *See* SDCL chapter 26-7A. The process is implicated when a child is abandoned, seriously endangered, or when the child's life or safety is in imminent danger and there is no time to apply for a court order. SDCL chapter 26-7A. When those circumstances are present, the child may be "remov[ed]" from his parent and "taken into temporary custody by a law enforcement officer[.]" SDCL 26-7A-12(2) and (4). A circuit court may also order temporary custody under similar circumstances on application of a state's attorney, a Department of Social Services social worker, or a law enforcement officer. SDCL 26-7A-13(1). In any of these situations, the court must issue a "written temporary custody directive" to hold the child in temporary state custody. SDCL 26-7A-13. The right to the so-called "48-hour hearing" arises because "[n]o child may be held in temporary custody longer than forty-eight hours . . . unless a temporary custody petition for an apparent abuse or neglect case or other petition has been filed, . . . and the court orders longer custody during a noticed hearing[.]" SDCL 26-7A-14. In these 48-hour hearings, the child's parents must be advised of their constitutional and statutory rights, including the right to be represented by an attorney. SDCL 26-7A-30. ICWA is implicated to an extent in these hearings involving the emergency removal or emergency placement of Indian children. ICWA requires "[t]he State authority, official, or agency involved" to immediately terminate the emergency removal or

placement in foster care[6] when it is no longer necessary to prevent imminent physical damage or harm to the child. 25 U.S.C.A. § 1922. "The State authority, official, or agency involved" must also "expeditiously initiate a child custody proceeding subject to the provisions of this [ICWA] subchapter, transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate." *Id.*

[¶30.] The text of these statutes makes clear that Irving was not entitled to the 48-hour hearing and its associated rights merely because Warrens filed a petition for a temporary guardianship. First, I.L.J.E. had not been "taken" into the State's "temporary custody" based on a State allegation that the child was "seriously endangered in the child's surroundings" and required "immediate removal." *See* SDCL 26-7A-12(2), -12(4). Indeed, even as late as the July status hearing, Irving's lawyer was maintaining this was neither an abuse and neglect case nor an ICWA case. Second, Warrens did not "remove" I.L.J.E. from his parents' custody. *See* 25 U.S.C.A. §§ 1922, 1903(1)(i). Rather, the child's custodial parent placed the child in Warrens' care and custody, and while Warrens were exercising that custodial authority given them by the child's parent, both biological parents became unavailable to care for the child. Consequently, at the time Warrens filed their petition for a temporary guardianship, they were simply seeking to continue the custodial relationship authorized by the child's parent.

*The Indian Child Welfare Act*

---

6. ICWA defines a "foster care placement" in part as "any action *removing* an Indian child from [the child's] parents . . . for temporary placement in . . . the home of a guardian[.]]" 25 U.S.C.A. § 1903(1)(i) (emphasis added).

[¶31.]       Irving finally argues the circuit court failed to properly apply ICWA in selecting the permanent guardians. ICWA "is based on the fundamental assumption that it is in [an] Indian child's best interest that [the child's] relationship to the tribe be protected." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 49–50 n.24, 109 S. Ct. 1597, 1609, 104 L. Ed. 2d 29 (1989). Irving points out that Warrens are not Indians, and he contends "Warrens have done little to nothing to preserve the values of the Lakota culture for I.L.J.E.[.]" He further points out that Dr. Jumping Eagle is an enrolled member of the Oglala Sioux Tribe, and he contends only Dr. Jumping Eagle will ensure that the child's relationship with the Tribe is ongoing and active. Therefore, he argues that considering ICWA, it was not in the child's best interest to appoint Warrens as guardians.

[¶32.]       Under ICWA, a guardianship determination requires the circuit court to consider the custodial "preferences" set forth in that Act. Members of an Indian child's "extended family" are given first preference. 25 U.S.C.A. § 1915(b). Although Warrens are not Indians, they are by definition "extended family" entitled to ICWA's first preference because they are I.L.J.E.'s maternal aunt and uncle. *See* 25 U.S.C.A. § 1903(2). Additionally, ICWA expert Luke Yellow Robe testified that ICWA preferences do not depend upon Indian blood and that the Oglala Sioux Tribe had no custom or practice different than the preferences in ICWA.

[¶33.]       In determining the suitability of a proposed guardian under both ICWA and the Guardianship Act, the circuit court must ultimately consider the child's "best interests." 25 U.S.C.A. § 1902; SDCL 29A-5-208. A determination of

best interests requires many things, including consideration of the extent to which the guardianship would "deprive[] the child of his . . . tribal and cultural heritage." *Holyfield*, 490 U.S. 30, 49–50 n.24.

[¶34.] Although Irving questions Warrens' commitment to Lakota culture and heritage and their willingness to maintain the child's connection with his Tribe, the evidence on this issue conflicted. The circuit court recognized that Warrens had not taken "direct action" to understand the Lakota culture or heritage. But the court also found that Warrens had the ability and willingness to address the child's Indian culture and heritage. It further found that Warrens "would promote working with [Dr. Jumping Eagle] to develop [the child's] cultural awareness and his heritage with the Lakota Nation." The court resolved this disputed question of fact in favor of Warrens and against Irving, a finding for which we are required to give the circuit court deference considering its ability to observe the witnesses testify and better judge their credibility. *See In re Conservatorship of Gaaskjolen*, 2014 S.D. 10, ¶ 19, 844 N.W.2d 99, 103.

[¶35.] Ultimately, "the selection of the person to be appointed guardian is a matter [that] is committed largely to the discretion of the appointing court." *In re Guardianship of the Estate of Jacobsen*, 482 N.W.2d 634, 636 (S.D. 1992). Here, the court not only considered native heritage and culture, the court also considered other best interest factors favoring Warrens, considerations that Irving does not contest on appeal. For instance, the court found that Warrens were better suited to address I.L.J.E.'s emotional needs, and it noted that Dr. Jumping Eagle never did petition for the guardianship. Considering all the evidence in the record, we cannot

#28479

say the circuit court clearly erred or abused its discretion in granting the guardianship to the child's maternal aunt and uncle.

[¶36.] Affirmed.

[¶37.] GILBERTSON, Chief Justice, and KERN and JENSEN, Justices, and KNOFF, Circuit Court Judge, concur.

[¶38.] KNOFF, Circuit Court Judge, sitting for SALTER, Justice, disqualified.